# Illinois Official Reports

## Appellate Court

***People v. Rouse*, 2014 IL App (1st) 121462**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUSTIN ROUSE, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-1462 |
| Filed<br>Rehearing denied | July 16, 2014<br>August 14, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder in a prosecution arising from a gang-related shooting was upheld over his contentions that the State's witnesses had a motive to lie, that the verdict was contradicted by the jury's special finding that defendant did not personally fire the weapon that killed the victim, and that the trial court abused its discretion in allowing the jury to view a surveillance video. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-13265; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier and Sarah Curry, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Neville and Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1 Defendant Justin Rouse, convicted of first degree murder before a jury, raises three issues on appeal. First, he contends reasonable doubt can be shown through the State's witnesses who, in implicating him, had a motive to lie and, hence, should not have been believed. Next, Rouse argues that the jury's special finding–that Rouse did not personally discharge the firearm that caused the victim's death–contradicts the verdict. Finally, Rouse maintains he was denied due process where, over defense counsel's objection, the trial court granted the jury's request to watch the surveillance footage.

¶ 2 We affirm. The credibility of the witnesses was a matter for the jury to decide and the evidence supported Rouse's conviction for first degree murder where eyewitness testimony, as well as his own admissions, linked him to the shooting. As to the special finding, Rouse forfeited this challenge, having failed to object at trial or include the claimed error in a posttrial motion, and we decline his invitation to review the error under the plain error doctrine, finding his argument has not met either prong of the doctrine. Regarding the jury's review of the recording in the presence of both parties and the court during jury deliberations, the trial court exercised proper discretion due to technical difficulties preventing the recording from being viewed in the jury room.

¶ 3                                    BACKGROUND

¶ 4 Justin Rouse was charged with two counts in the shooting death of Jose Regalado: first degree murder and personally discharging a weapon during the commission of the murder. A jury found him guilty of first degree murder and the trial court sentenced Rouse to 32 years' imprisonment.

¶ 5 On June 15, 2008, someone shot Regalado while he and a friend worked on a car in the alley behind his apartment complex. The State's theory was that La Raza street gang members entered the alley and shot Regalado after being informed that members of a rival gang, the Latin Kings, were in the alley.

¶ 6    At the time of the shooting, the La Raza street gang consisted of two groups. The first group, the "North Pole," hung out in the Rogers Park neighborhood at the intersection of Clark and Estes Streets. The second group, the "West Side Sect," hung out at Harding and Wabansia Streets. The day of the shooting, members of both groups met at Homberto "Psycho" Cornell's apartment at 1360 West Touhy to discuss Eric Roman's decision to leave the gang. (Throughout his brief, Rouse refers to Cornell as Coronel. At trial, the witness identified himself as "Homberto Cornell.")

¶ 7    Eric Roman testified he joined the La Raza street gang when he was 15 or 16 years old and was 19 or 20 when he tried to leave. He claimed he never attained a rank within the gang. Roman met with Rouse, Cornell, Chandel "Shadow" Ramsey, and Liborio "Lobo" Beltran, all members of the North Pole group. "Monster," the leader of the West Side Sect, and his brother also attended the meeting. Roman described Monster as tall and weighing about 400 pounds. According to Roman, the west side group had more power than the North Pole group.

¶ 8    When the meeting ended, Roman, Rouse, Cornell, Ramsey and Beltran walked four or five blocks to the intersection of Clark and Estes. Monster drove to the intersection in his white van. At the corner, someone from the west side group asked who had "security," meaning a weapon. Roman heard Rouse say he was going to get a gun. Rouse then left the group by himself and returned 20 minutes later.

¶ 9    Roman walked over to the southeast corner of Clark and Estes and stood in front of the Laundromat while other gang members stood in front of a Chinese restaurant on the northeast corner of the intersection. Roman saw a police officer approach a few men standing in front of the restaurant. Roman did not see who the officer spoke with, but he testified that no one was arrested. When the police officer left, Roman saw some of the La Raza gang members return to the corner.

¶ 10    At the time of the shooting, the victim, Jose Regalado lived with his girlfriend, Sonia Gonzalez, and their daughter, in an apartment building at 1729 West Touhy. Around 8:30 that night, Regalado and a friend, Martin Hernandez, were in the parking lot behind the building installing speakers in Hernandez's car. Sonia Gonzalez's sister, Alicia, lived in the same apartment building and was talking to the men though her bedroom window as they worked. Five minutes after she stopped talking with them, Alicia heard a gunshot. She turned to look outside her bedroom window and saw five men running from the parking lot and southbound in the alley. Alicia did not recognize any of them. Alicia ran to the parking lot where she saw Regalado lying by the car faceup. He had been shot in the head. Alicia called the police.

¶ 11    Roman testified that just before the shooting, he saw Beltran leaving the alley riding a bike on the east side of Clark Street. Beltran said "Kings" were in the alley, referring to the Latin Kings street gang, a rival of the La Raza gang. Rouse stood on the corner of Clark and Estes with some other La Raza gang members. Roman saw gang members from both groups of the La Raza street gang get together and talk, but he could not hear what they were saying because he was too far away. He saw Rouse, Cornell, Ramsey, and Beltran, along with three unidentified West Side members, enter the alley. Roman did not see the shooting, but he saw those same men run out of the alley after he heard a gunshot.

¶ 12    Ramsey testified that after the meeting about Roman's future with the gang, he was hanging out at the corner of Clark and Estes Streets with Beltran. When the police

approached the gang members gathered in front of the Chinese restaurant, Ramsey and Beltran walked away. They returned to the corner after the police left. A short time later, Ramsey saw two members of the West Side Sect walk into the alley. When those two men returned to the corner, they said there was a Latin Kings gang member in the alley. Then, six or seven La Raza gang members, including Rouse and Cornell, walked into the alley. Ramsey and Beltran followed the group into the alley. Ramsey testified he did not know if anyone had a gun.

¶ 13    As the group approached the alley, Ramsey saw Regalado and Hernandez working on a car. Ramsey heard the gang members tell the men, in Spanish and while flashing gang signs, to "throw down the crown," a sign of disrespect to the Latin Kings. Cornell approached Regalado and Hernandez first and punched Regalado in the face. Ramsey testified Rouse then pulled out a gun from his pocket and shot Regalado. Ramsey turned around and ran out of the alley.

¶ 14    Homberto Cornell testified at trial after pleading guilty to a reduced charge of conspiracy to commit first degree murder for his role in Regalado's death. Cornell received 14 years' imprisonment.

¶ 15    Cornell testified he was on the corner of Clark and Estes with 10 members of the North Pole group of the La Raza gang and 5 members of the West Side Sect when the police pulled up. Cornell walked into the Chinese restaurant and the police followed him and then put him into a squad car. The officers took notes of Cornell's identification and what he was wearing, but did not arrest him.

¶ 16    After the police left, Cornell saw Gustavo, a member of the North Pole group, walk into the alley that ran north and south between Estes and Touhy, on the east side of Clark Street. Gustavo came back and said there were Latin Kings in the alley. Cornell heard Monster say that someone should go get a gun and then saw Rouse, Ramsey, and Gustavo leave. When the men returned a short time later, Cornell did not see a weapon. Rouse, Cornell, two members of the West Side Sect, Monster's brother and another male, all went into the alley to confront the Latin Kings. Monster's brother said something to Regalado and Hernandez. Cornell did not recognize Regalado and Hernandez and did not know if they were members of the Latin Kings. Monster's brother yelled, "King killers," a sign of disrespect to the Latin Kings. Cornell did not have a gun and did not see a gun on either Regalado or Hernandez.

¶ 17    After Monster's brother disrespected the Latin Kings, Cornell approached Regalado, punched him in the face and threw a beer bottle at Hernandez. When someone behind him yelled "move," Cornell turned around and ran back in the direction he had come. As he was running, Cornell saw Rouse, five feet ahead, standing with his hands in front and holding a black object. Cornell testified he and Rouse did not have anything covering their faces, but the West Side Sect wore bandanas over theirs. Rouse and the other gang members also ran back to the corner of Clark and Estes.

¶ 18    Martin Hernandez testified he grew up with Regalado in Mexico and that they had been friends for years. He acknowledged he had a pending charge of aggravated criminal sexual assault. Hernandez testified that while he and Regalado were in the parking lot installing speakers in his car, he heard someone running. When he looked up, someone threw a beer bottle at him. He saw five to seven people running toward them yelling, "king kill." Hernandez testified that one of the men, whom he described as a "Latin guy," punched Regalado and then someone shot Regalado in the forehead. Hernandez recalled the shooter

- 4 -

was African American, but he testified he could not see his face because it was covered with a bandana. Hernandez did not hear anyone ask them any questions before the shooting. Hernandez testified that neither he nor Regalado was a gang member. He did not see where the shooter went after Regalado was shot.

¶ 19        Roman had two prior convictions for burglary and had been arrested for a misdemeanor cannabis charge two days before he testified at Rouse's trial. Roman testified that after the shooting, he stood around until the police and ambulance arrived. He then walked by himself east on Touhy Avenue to Sheridan Road, near Lake Michigan. When he arrived, other La Raza members were there, including Rouse, Cornell, Ramsey, Beltran, and some members of the West Side Sect. He talked with the group about the shooting. Roman asked Rouse if he had "done it or not," to which Rouse replied, "he just had to hide."

¶ 20        Cornell and Ramsey testified they also ran to the lakefront after the shooting. Cornell testified he saw Rouse when he arrived. Ramsey testified there were no other La Raza gang members there.

¶ 21        Chicago police detective Mark Leavitt, on assignment in the Rogers Park neighborhood on the night of the shooting, received a radio call that a man had been shot in the rear of 1729 West Touhy Avenue. When he arrived there, he saw several police officers, an ambulance, and a group of people by a car. Detective Leavitt secured the crime scene. He noticed that the supermarket to the west side had surveillance cameras on the rear of the building, which faced the alley. Detective Leavitt spoke with the store owner and was able to immediately get a copy of the surveillance footage.

¶ 22        Chicago police forensic investigator Jill Kolssak and her partner, Officer Kathleen Gahagan, processed the crime scene. They recovered various beer bottles from the parking lot and a black Nike shoe. They left the scene and went to the hospital to take photographs of Regalado and to place bags around his hands to preserve any physical evidence.

¶ 23        While inside the supermarket, Detective Leavitt heard an alert for Cornell and Ramsey. The police located Ramsey and after speaking with him, sought Cornell, Rouse, "Whale," and Beltran. Over the next two days, Detective Leavitt and other police officers spoke to several people during their investigation, including Rouse, who turned himself in to the police on June 16.

¶ 24        After interviewing Rouse, Detective Leavitt sought Cornell and Angelica Parish, whom Rouse identified as his girlfriend. Detective Leavitt called Cornell, and during their telephone conversation, Cornell agreed to turn himself in. Following their conversation, Detective Leavitt began looking for Roman. He found Roman in prison and spoke with him there.

¶ 25        On June 17, 2008, Martin Hernandez went to the police station and viewed three different lineups. He was unable to identify the shooter from any of them. At trial, he testified he did not remember seeing Rouse in a lineup.

¶ 26        Cook County deputy medical examiner, Dr. Michael Humilier, conducted Regalado's autopsy. He noted a gunshot entrance wound on the right side of Regalado's forehead and removed a deformed small-caliber lead bullet from Regalado's skull. There was no evidence of close-range shooting. Dr. Humilier opined that Regalado's death was caused by a gunshot wound to the head and the manner of death was homicide.

¶ 27        The parties stipulated that Chicago police officer Leonard Stocker, a forensic investigator on June 16, 2008, received several envelopes containing evidence from Regalado's autopsy,

including the bullet. The parties further stipulated that if called to testify, Chris Westrelli, a forensic scientist with the Illinois State Police Forensic Science Center and an expert in the field of firearms and ballistics analysis, would testify that the bullet recovered from Regalado was not suitable for comparison.

¶ 28 Angelica Parish, Rouse's girlfriend, testified that she was at home with her children watching a basketball game. Rouse had been with her earlier in the day but had left before the game started. Parish testified that Rouse returned during the fourth quarter of the game and appeared "anxious, sweaty, and nervous." Parish had never seen Rouse act that way before. When she asked him what was wrong, Rouse replied, "he shot someone." Rouse told Parish he shot "a boy *** in the top of his head" and "the boy had slumped over." Rouse slept at Parish's house that night and told her that if the police came, she should tell them he was at her house all day.

¶ 29 The next day, the police came to Parish's house and asked her if she knew Rouse. She replied that she did, and when the police asked if Rouse was at her home the day of the shooting, she told them that he had been with her all day. She testified she initially lied to the police because she was afraid for Rouse and did not want him to get in trouble. After she lied about where Rouse had been, the police told her they knew he had not been with her and warned Parish that if she did not tell the truth, her children could be taken away. She testified she told the police the truth–that Rouse had not been with her.

¶ 30 Rouse did not present any evidence on his own behalf. The jury found him guilty of first degree murder, but it acquitted him of the second charge–personally discharging a firearm during the commission of the murder. The court sentenced Rouse to 32 years in prison.

¶ 31                                               ANALYSIS
¶ 32                                    Sufficiency of the Evidence
¶ 33 Rouse challenges the sufficiency of the evidence, arguing that all of the witnesses who implicated him had a motive to lie. He contends the testimony of the witnesses was incredible and conflicting. He argues that another detriment to the State's case is that there was no physical evidence linking him to the shooting and the only objective eyewitness, Hernandez, was unable to identify him out of a lineup as the shooter. Rouse argues that each of these reasons alone creates reasonable doubt as to his guilt, but together, they require that his first degree murder conviction be reversed.

¶ 34 In reviewing the sufficiency of the evidence to sustain a conviction on appeal, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Thomas*, 178 Ill. 2d 215, 231-32 (1997). We will not substitute our judgment for that of the trier of fact on the weight to be given the evidence or the credibility of the witnesses. *Thomas*, 178 Ill. 2d at 232. The trier of fact must "resolve conflicts in the testimony, *** weigh the evidence, and *** draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

¶ 35 To prove a defendant guilty of first degree murder, the State must prove the defendant either intended to kill or do great bodily harm to an individual or he or she knew that his or

her acts would create a strong possibility of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2008).

¶ 36    Roman testified he heard Rouse say that he was going to get a gun and, then, after someone yelled that there was a member of the Latin Kings street gang in the alley, he saw Rouse with Cornell, Ramsey, and Beltran enter the alley where Regalado was shot. Immediately after the group went into the alley, Roman heard a gunshot.

¶ 37    Ramsey testified he heard someone yell that there was a "King" in the alley and then saw Rouse, Cornell and four or five members of the West Side Sect enter the alley. Ramsey and Beltran followed the group into the alley. Ramsey saw Cornell punch Regalado in the face and then saw Rouse pull out a gun and shoot him. Ramsey identified Rouse in the store surveillance recording as being in the alley at the time of the shooting.

¶ 38    Cornell testified he also heard that members of the Latin Kings street gang were in the alley and then saw Rouse leave the area for a short time to get a gun. Cornell admitted that he, Rouse, and two members of the West Side Sect entered the alley to confront the Latin Kings gang members. Cornell admitted he punched Regalado in the face and threw a beer bottle at Hernandez even though he did not recognize either of them as gang members nor did he see them armed with a weapon. When Cornell heard someone yell "move," he ran back to where he had come from. As he was running, Cornell saw Rouse in front of him holding a black object with outstretched hands. When Cornell turned himself in to the police on June 17, 2008, he identified Rouse from a photographic array.

¶ 39    Hernandez testified that while installing speakers in his car with Regalado, he heard people running. As he looked up, someone threw a beer bottle at him. He witnessed Regalado being punched and then shot. He viewed a lineup and identified Cornell as the Hispanic male who punched Regalado. He was not able to identify the shooter from a lineup because the shooter's face was covered with a bandana. Hernandez testified the shooter was an African American male.

¶ 40    Rouse's post-arrest statements to Roman and Parish further support his conviction for first degree murder. When the group met at the lakefront after the shooting, in response to Roman's question about what had happened, Rouse told him "he just had to hide." Parish testified that when Rouse returned to her house after the shooting, she noticed that he was "anxious, sweaty, and nervous." When she asked him what was wrong, Rouse admitted that "he shot someone." He explained that he had shot a boy in the forehead and that he had "slumped over." He told her that if the police asked about him, she should reply that he had been with her all day. She testified that although she initially lied to the police to protect Rouse, she told the truth–that he was not with her at the time of the shooting–when the police told her that her children could be taken away.

¶ 41    Rouse asks this court to apply the principle discussed in *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), "the fact a judge or jury *** accept[ed] testimony does not guarantee it was reasonable to do so." Rouse attacks the credibility of each eyewitness's testimony and argues that reasonable doubt was created by the inconsistencies in their recollections, and that pursuant to the language in *Cunningham*, we should find the State's witnesses' testimony insufficient to prove him guilty of first degree murder.

¶ 42    Rouse argues no reasonable jury could find Cornell credible because Cornell was charged along with Rouse with the first degree murder of Regalado. Hernandez identified Cornell out of a lineup as the individual who punched Regalado in the face just before the shooting.

Rouse argues Cornell's testimony must be regarded with skepticism because Cornell, as the only other individual positively identified in the alley during the shooting, risked a longer prison term if he did not implicate Rouse and the State allowed Cornell to plead guilty to a reduced charge of conspiracy in exchange for his testimony against Rouse. See *People v. Holmes*, 141 Ill. 2d 204, 242 (1990) (testimony of accomplice witness has "inherent weaknesses" and is "fraught with dangers of motives such as malice toward the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution" (internal quotation marks omitted)).

¶ 43    Rouse's attack on Cornell's testimony fails. Although the testimony of an accomplice must be "cautiously scrutinized on appeal," the "inherent weaknesses" of the testimony affect only the weight of the evidence and credibility to be attributed to the witness's testimony and, therefore, are matters within the providence of the trier of fact. (Internal quotation marks omitted.) *Holmes*, 141 Ill. 2d at 242. The jury heard evidence of Cornell's criminal background and the negotiated plea agreement. The jury properly considered this information along with the substance of Cornell's testimony in light of the rest of the evidence presented. As the trier of fact, the jury assessed the credibility of Cornell as a witness and decided the weight to be given to his testimony and the inferences to be drawn. The jury also properly determined how it wished to resolve the conflicts in the evidence. *Jackson*, 443 U.S. at 319. Accordingly, we refuse Rouse's request to reverse his conviction on questions involving the credibility of Cornell as an accomplice witness where the evidence is not so unreasonable, improbable, or unsatisfactory to justify reasonable doubt as to Rouse's guilt.

¶ 44    Rouse also argues Ramsey's testimony must be discounted. He claims Ramsey had motive to lie about Rouse being the shooter because Ramsey was the only other African American in the group. Rouse argues that because Hernandez identified the shooter as being African American, if Rouse was not identified as the shooter, Ramsey would be the next likely choice. Ramsey implicated Rouse after the police came to his house in the early morning hours of June 16, took him in a squad car to the police station, told him they had a video of the shooting, and explained that he could be charged as an adult with first degree murder even though he was only 14. At the time of his testimony, Ramsey was on probation for a juvenile aggravated battery with a deadly weapon charge and he had a pending contempt case for his failure to appear. Rouse argues that under these circumstances, Ramsey had motive to lie.

¶ 45    There was no evidence identifying Ramsey as the shooter. There was no evidence that, when the police informed Ramsey he could be charged with first degree murder, they told him they had evidence that he was the shooter or that someone had identified him as the shooter. Ramsey testified at trial that despite being told he could be tried as an adult for first degree murder, he did not believe he was being arrested for first degree murder.

¶ 46    A trier of fact is free to accept or reject "as much or as little" of a witness's testimony as it likes. *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004). We disagree with Rouse that if the jury found Ramsey credible and accepted his testimony as evidence of Rouse's guilt, it acted improperly. Witness credibility falls exclusively on the jury.

¶ 47    Next, Rouse argues Roman's testimony is incredible based on his criminal background. Rouse argues that because Roman was in jail, serving time on two burglary convictions, when he initially spoke with the police eight months after the shooting, he had motive to lie. Rouse argues Roman's credibility was further damaged because he was facing a contempt

charge for his failure to appear in this case and he was arrested on marijuana charges just a few days before he testified. Rouse argues Roman's pending criminal matters provided motive for him to lie.

¶ 48     No evidence was offered that Roman was promised anything or received any favorable treatment when he initially spoke with the police about Regalado's shooting.

¶ 49     Rouse argues that Roman's trial testimony makes his dishonesty "apparent." Roman testified he did not have a rank within the La Raza street gang, yet Cornell testified Roman's rank was "first seat," meaning he was in charge of the North Pole group. If Roman told any member of the group to do something, he would have to do it.

¶ 50     Rouse contends Roman's testimony is also suspect because of the vantage point from which he observed all of the events surrounding the shooting. When the gang members left Cornell's apartment, they all went to the corner of Clark and Estes. Everyone went to the northeast corner by the Chinese restaurant, but Roman went to the southeast corner by the Laundromat. Rouse argues that Roman's observations must be discounted because they were made from across Clark Street, a busy street. Rouse argues Roman's testimony that he could see what his fellow gang members were doing on the other side of the street and that he could hear Monster ask who had security and Rouse respond that he was going to get a gun is incredible.

¶ 51     Rouse argues that Cornell's, Ramsey's, and Roman's individual accounts cannot coexist because they are inconsistent on key points, and when taken together, "downright unbelievable." According to Rouse, the group decided to make him the "fall guy–maybe because he was not part of La Raza, 'The Race.' " Rouse further contends that despite the inconsistencies, the actual testimony of each of these witnesses does not support his conviction. Cornell did not see who shot Regalado. Roman was in the Laundromat at the time of the shooting and could not identify the shooter. Although Ramsey testified he saw Rouse shoot Regalado, his testimony is the least reliable because he was the only other African American in the group and, therefore, if he did not implicate Rouse, he would be named the shooter. Rouse argues their testimony cannot support his conviction.

¶ 52     We are unpersuaded by Rouse's contention that Ramsey, Roman, and Cornell conspired together to accuse Rouse of Regalado's shooting because he was not a member of the La Raza street gang. There is no evidence supporting Rouse's theory. All three witnesses testified Rouse was a member of the La Raza gang.

¶ 53     We are also unpersuaded by Rouse's argument that reasonable doubt was created by the inconsistencies in the witnesses' recollections. This court has previously recognized, it "is not the role of this court to reevaluate the credibility of witnesses in light of inconsistent testimony and ostensibly retry the defendant on appeal. [Citation.] Whether minor inconsistencies in testimony irreparably undermined the credibility of the State's witnesses was a matter for the trier of fact to decide." *People v. Howard*, 376 Ill. App. 3d 322, 329 (2007). Whether the minor inconsistencies between the recollections of Ramsey, Roman, and Cornell irreparably undermined their credibility was a matter for the jury to decide.

¶ 54     Concerning Hernandez's testimony, Rouse argues that because he was able to identify Cornell from a lineup as the man who punched Regalado, "his failure to identify [Rouse] should be given great consideration." But, Hernandez explained his failure to identify Rouse from the lineup by the fact that the shooter's face was partially covered by a bandana. Hernandez recalled only that the shooter was African American. The jury properly decided

- 9 -

what weight to attribute to Hernandez's testimony and what, if any, reasonable inferences it could draw from his testimony recalling the shooting, in light of his failure to identify Rouse in the lineup.

¶ 55    Lastly, Rouse attacks the credibility of Parish's testimony, suggesting she lied because the police threatened to take away her children. While it is plausible that Parish lied to the police about where Rouse had been the night of the shooting to protect her children, the jury heard all of the evidence and properly could accept her testimony that she initially lied to the police.

¶ 56    Rouse's challenge to the sufficiency of the evidence is a request that this court reevaluate the evidence based solely on the credibility of the witnesses. The jury, as the trier of fact, determines the credibility of the witnesses, the weight to be given the testimony, and the reasonable inferences to be drawn from the evidence. *Jackson*, 443 U.S. at 319. The jury properly performed its function here.

¶ 57    In addition to the eyewitness testimony implicating Rouse, his postarrest statements to Roman and Parish further supported his conviction. After the shooting, numerous gang members met at the lakefront, where Rouse responded to Roman's question about what happened in the alley by saying "he just had to hide." Parish testified that when Rouse returned to her house, she noticed he was "anxious, sweaty, and nervous." When she questioned him, Rouse confessed "he shot someone."

¶ 58    Although there was no physical evidence linking Rouse to the shooting, lack of physical evidence does not raise a reasonable doubt where an eyewitness has positively identified defendant as the perpetrator of the crime. See *People v. Clarke*, 391 Ill. App. 3d 596, 610 (2009) (lack of physical evidence did not render jury's finding unsatisfactory where eyewitness positively identified defendant as shooter and defendant gave videotaped confession).

¶ 59    We disagree with Rouse's contention that weaknesses in the State's evidence create reasonable doubt of his guilt. His argument regarding the sufficiency of the evidence is unpersuasive because the weaknesses in the evidence he challenges on appeal were all presented to, and rejected by, the jury. We hold that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found, beyond a reasonable doubt, that Rouse committed first degree murder. We affirm Rouse's conviction.

¶ 60                               Special Interrogatory

¶ 61    Rouse argues the jury's negative answer to the special interrogatory, asking whether the State proved beyond a reasonable doubt that he personally discharged the firearm that proximately caused Regalado's death, negates his conviction for first degree murder. Rouse argues the two are legally inconsistent.

¶ 62    Rouse reasons that the jury's negative answer to the special interrogatory must have meant the jury did not find that the State proved that Rouse was the shooter. He argues that the same lack of proof of identity applies to the first degree murder charge, fatally undermining it.

¶ 63    The State submitted the special interrogatory to obtain a sentence enhancement under section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008)), in compliance with *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

¶ 64    Rouse failed to object to the verdict at trial or raise the issue in a posttrial motion, forfeiting review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Recognizing this, Rouse urges the plain error doctrine under which we may review a forfeited error when either (1) "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence" or (2) "the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). The defendant bears the burden of persuasion under both prongs. *Id.* at 187. If the defendant fails to meet this burden, "we must honor the procedural default" created by his or her failure to properly preserve the claim for review. *People v. McCoy*, 405 Ill. App. 3d 269, 273 (2010).

¶ 65    The plain error exception to the waiver rule does not save Rouse's claim of error. As we have already discussed, the evidence was not closely balanced. Further, Rouse has not persuaded us that the alleged error was so substantial that it deprived him of a fair trial. Rouse forfeited review of his claim and has not met his burden of persuasion under either prong of the plain error doctrine such that his forfeiture should be excused. We will not review Rouse's contention on its merits.

¶ 66                                    Surveillance Recording

¶ 67    Lastly, Rouse argues his due process rights were violated when the trial court, in response to a jury note, allowed the jury to view surveillance footage in the courtroom during deliberations. Rouse does not challenge the trial court's decision to allow the jury to view the recording, only the court's accommodation of the jury's request by having the jury view the surveillance footage in the courtroom in the presence of both parties and the trial judge.

¶ 68    During trial, the jury was shown a surveillance recording of a portion of the alley near where the shooting took place. There was no footage of the actual shooting. The entire recording was shown to the jury, which included footage from 7:44 p.m. to 9:09 p.m. on June 15, 2008. Without objection by defense counsel, the State admitted the recording as an exhibit and focused its attention on the short footage showing a group of people entering and exiting the alley. The jury received two discs: the complete surveillance footage and a shorter version.

¶ 69    During deliberations, the jury sent out a note requesting to watch the surveillance footage. Due to technical difficulties, the jury was unable to watch the recording in the jury room. The only way to view the recording was on a laptop computer, but there was not one available that would allow the jury to view the surveillance footage without fear that the jury would also have access to unauthorized materials. The court decided there were two options: (1) allow the jury to view the recording in the courtroom in the presence of both parties and the judge or (2) inform the jury it could not view the surveillance footage.

¶ 70    Defense counsel argued the jury should not be shown the recording. Counsel contended that by showing the jury the surveillance footage in the courtroom, the parties and the judge would become part of the deliberation process and the jury could be "contaminated" by their presence.

¶ 71    Over defense counsel's objection, the trial court ruled that the jury would be brought into the courtroom to watch the recording in the presence of both parties and the judge. The trial judge asked the foreperson if there was a particular part of the recording the jury wished to

view. The foreperson responded, "We would like to see the people who were headed into the area that is off camera."

¶ 72     The trial judge informed the jury that it would not be able to view the surveillance footage in the deliberation room, but that it could view the portion it requested in the courtroom in the presence of the parties. The judge instructed the jury that while the recording played, the jurors could not engage in any deliberations or have any discussions about what they were watching. The judge told the jurors that after the recording played, they would return to the deliberation room, but could request to view the recording as many times as they wished and would be brought back into the courtroom to do so. The requested footage was then played for the jury. The jury returned to the jury room to continue deliberations.

¶ 73     Rouse argues that requiring the jury to watch the surveillance footage in the presence of the parties and the trial judge "infringed upon the sanctity and privacy that is so critical to jury deliberations." Rouse acknowledges the court had "the best of intentions" in allowing the jury to watch the recording in the manner it did, but contends defense counsel's objection should have been sustained "because the necessity for secrecy and privacy in the jury's deliberations is paramount." Rouse claims the jury requested to see the surveillance recording during deliberations to discuss it and because the court could not accommodate that request, it should not have allowed the jury to view the footage at all.

¶ 74     Rouse cites several cases in support of his position. None are factually similar. Unlike the cases Rouse relies on, no one from the prosecution, or any other unauthorized individual, was given exclusive access to the jury while the jurors were deliberating inside of the jury room. *Cf. United States v. Freeman*, 634 F.2d 1267 (10th Cir. 1980) (jury requested audiotape, trial court had government agent enter jury deliberation room to play tape for jury without notice to either party); *United States v. Pittman*, 449 F.2d 1284 (9th Cir. 1971) (government agent entered jury room to play requested audiotape for jury, exclusive access to jury held inappropriate); and *United States v. Florea*, 541 F.2d 568 (6th Cir. 1976) (trial court improperly allowed prosecution witness to enter jury room during deliberations and play audiotape).

¶ 75     Rouse also directs our attention to *People v. Gleason*, 36 Ill. App. 2d 15 (1962). In *Gleason*, the jury used the courtroom for its deliberations. *Id.* at 17. Two bailiffs were present throughout the jury deliberations. *Id.* The bailiffs did not communicate with the jurors and sat about ten rows away. *Id.* This court reversed the defendant's conviction, finding "[t]he continuous presence of the bailiffs in the 'jury room' may have had an effect never accurately ascertainable because perhaps not consciously known to the jurors themselves. The risk involved in such practice is far too great to be tolerated." *Id.*

¶ 76     Rouse argues that just as in *Gleason*, the prejudicial effect of the trial court's influence here is impossible to measure and, therefore, the court's actions were erroneous and a new trial is required. We disagree.

¶ 77     The trial court has discretion to determine whether to grant or deny the jury's request to review evidence or a transcript of witnesses' testimony. *People v. Kliner*, 185 Ill. 2d 81, 163 (1998). The decision of what exhibits the jurors may have in the jury room is also one left to the discretion of the trial court. *People v. White*, 2011 IL App (1st) 092852, ¶ 59 (citing *People v. McDonald*, 329 Ill. App. 3d 938, 947 (2002)). The trial court's decision will not be reversed absent an abuse of that discretion. *Id.*

¶ 78    Allowing the jury to view the surveillance recording in the courtroom in the presence of both parties and the trial judge was an exercise of the trial court's discretion. The trial court's accommodation of the jury's request was done after the court considered all of the reasonable alternatives. The trial court showed only the portions of the recording the jury requested, but also informed the jury that it could view the recording as often as it wished. The trial court cautioned the jury not to engage in deliberations or discussions while in the courtroom.

¶ 79    No one communicated with the jurors while they viewed the recording. After viewing the recording, the jury returned to the jury room to deliberate. Under the record before us, we find no indicia of prejudice or anything improper having occurred during the replay of the surveillance footage.

¶ 80    While nothing of legal significance occurred during the viewing, the better approach would have been for the trial judge to grant the jury's request to watch the surveillance footage on the "unclean" laptop, with instruction to the jury that they not use the laptop for any other purpose than to view the footage, and then after the jury completed viewing the recording, have the jury return the laptop. Our system relies heavily on instructions to the jury and the presumption that such instructions are followed. "The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them. *** [W]e adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

¶ 81    For perspective, we offer some words of wisdom from Chief Judge David L. Bazelon, concurring in *United States v. Dougherty*, 473 F.2d 1113, 1142 (D.C. Cir. 1972) (Bazelon, C.J., concurring in part and dissenting in part), "Trust in the jury is, after all, one of the cornerstones of our entire criminal jurisprudence, and if that trust is without foundation we must re-examine a great deal more ***." There are numerous instances throughout a jury trial in which the jury is instructed to act a certain way. Jurors are routinely told that they must not do their own research on the case they are deciding, not discuss the case during trial, and not consider the question of sentencing. They are instructed to disregard certain evidence they have been improperly exposed to or consider certain evidence only for a limited purpose. Trusting juries to follow instructions is a practical necessity. See, *e.g.*, Peter J. Smith, *New Legal Fictions*, 95 Geo. L.J. 1435, 1491-92 (2007).

¶ 82    We note that in this situation the better way to have proceeded would have been to clearly instruct the jurors on what was expected of them (which the trial judge did an excellent job of doing here) and, then, trust the jurors to act accordingly. Only if a breach of that trust occurs, should the court take curative measures.

¶ 83    Rouse further argues the trial court improperly influenced the jury by inquiring which portion of the recording the jurors wished to see and only showing that portion. The State replies that the trial court inquired as it did to avoid needlessly prolonging the jury deliberations, particularly in light of the fact that the jury had viewed the entire recording during trial. Rouse argues that the court's actions could have led the jury to believe there was important evidence in the shorter version of the recording that was not presented in the longer version.

¶ 84    Rouse's contention misconstrues the record. The jury had been given two discs of the surveillance recording. By inquiring whether there was "some particular part of the video

- 13 -

surveillance the jury wishes to observe," the court was not unduly influencing the jury, but merely giving the foreperson a chance to explain the jury's request, so the court could comply. We find no abuse of discretion in the trial court's response to the jury's request.

¶ 85        Affirmed.