2025 IL App (1st) 240695-U

No. 1-24-0695

Order filed August 4, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 6203 |
| | ) | |
| FERMIN PEREZ a/k/a FRED PEREZ, | ) | The Honorable |
| | ) | Steven Jay Rosenblum, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The evidence at trial was sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 2     Following a jury trial, defendant Fermin Perez, also known as Fred Perez, was convicted of aggravated unlawful restraint (720 ILCS 5/10-3.1(a) (West 2022)) and aggravated battery (720 ILCS 5/12-3.05(d)(1) (West 2022)) and sentenced to two concurrent terms of five years in prison. On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt

because its case relied entirely on the incredible, impeached testimony of the victim, his mother Gloria Perez (hereinafter Gloria). For the reasons that follow, we affirm.

¶ 3    Defendant's convictions arose from the events of April 13 and 14, 2023. Following arrest, defendant was charged by indictment with one count each of aggravated unlawful restraint, aggravated battery, and domestic battery. The matter proceeded to a jury trial on all three counts.

¶ 4    In opening statements, the State argued to the jury that it would "hear everything you need to hear" about the case from Gloria's testimony. Defense counsel asked the jurors to listen to Gloria's testimony and pay attention to whether it "make[s] any sense." In particular, counsel asserted that Gloria would not testify to having sustained any visible injuries or having sought medical care. Counsel also asserted that Gloria would testify that she was wearing a panic button around her neck throughout the entire incident with defendant but did not press it until six hours after she was allegedly attacked.

¶ 5    Gloria testified through an interpreter that in April 2023, she was 67 years old and lived in a house in Oak Lawn with defendant, who "came to visit." Around 11:30 p.m. on April 23, 2023, she was in her kitchen with defendant when he threw a beer bottle at her, which hit her in the back and broke. Gloria asked defendant to clean it up. When asked how defendant responded, she stated, "I don't remember what his response was, but first he hit me with his open hand here in the face. Then he threw me to the ground. He kicked me. Then he picked me up from the floor by the hair." She specified that he hit her in the face twice. After picking Gloria up by the hair, defendant grabbed a kitchen knife, "put it" on the upper area of her chest, and said he could kill her. In court, Gloria identified a knife as the one defendant used to threaten her. She also stated that, at the time defendant threw her down, she told him "that he was dealing with a 67-years-old person."

¶ 6     Defendant stopped holding the knife to Gloria's chest, approached her nearby pet parrot, and threatened to kill it. Then, leaving the knife in the kitchen, he took Gloria's phone to the living room, where he removed the battery and broke the phone by stepping on it. Defendant lay down on a couch and directed Gloria to sit on a different couch. Defendant told her she could not go to the bathroom or move from her seat because "he was the one who said what to do." She agreed that defendant was in control of her movements at the time.

¶ 7     Gloria waited for defendant to fall asleep so she could call the police. At some point, she fell asleep herself. When she woke up, about four hours after she and defendant had moved to the living room, defendant was sleeping on the floor. She took her dog outside to "make sure [defendant] wasn't waking up *** [s]o I could call the police." Gloria then called the police by pressing her panic button several times. She estimated that she pressed the button around 5 a.m. She knew the police could not call her in response because her phone was broken. When she saw police lights through her window, she ran outside. In response to the question, "Ma'am, throughout the entire attack were you free to leave your house?" Gloria answered, "No. Before that, yes. At that time, no."

¶ 8     On cross-examination, Gloria agreed that she was wearing the panic button around her neck during the incident with defendant. When the police arrived, she conveyed what had happened and told an officer she did not want to go inside the house because she could be killed. Gloria denied telling the police that she went to her bedroom after defendant broke her phone, reiterating that she stayed in the living room and that, although she wanted to go to the bathroom, defendant would not let her. She clarified that she did not go outside with her dog; rather, she opened the door, and the dog went outside by itself. When asked, "Then you decided you would

push your panic alarm?" she answered, "Yes. When I saw he was asleep I press [*sic*] it." Gloria agreed that she did not go to the hospital for treatment of any injuries.

¶ 9    Oak Lawn police officer Daniel T. Rehder testified that around 5:28 a.m. on the day in question, he was dispatched to respond to a burglar alarm. The address he was given was on a lighted road, but "it was pretty dark." When Rehder arrived at the house, a woman, later determined to be Gloria, ran up to his squad car. She was crying hysterically, her breathing was labored, and she seemed to be in distress. At first, Gloria spoke to Rehder in Spanish. Once she realized he did not speak Spanish she said in English, "He's trying to kill me."

¶ 10    Rehder requested that a Spanish-speaking officer respond to the scene. With that officer's assistance, he interviewed Gloria in the driveway and learned that the person Gloria was referring to was her son, defendant. Following that conversation, Rehder and two other officers entered the house, intending to place defendant into custody for domestic battery. At some point, Rehder went into the kitchen and saw a "large bread knife," which was eventually inventoried. The officers walked through the first floor and did not locate any people.

¶ 11    Rehder heard noises coming from the second floor. He announced his office and gave commands, but no one responded. He and the other two officers looked up the stairwell, which led to a closed door. They announced their office, called out commands, and called defendant's name "to have him come down and have a conversation." After some time, Rehder heard floorboards creaking. Because the stairway was narrow and the door would open outwards, they stayed on the first floor and continued to give commands. Eventually, Rehder went back to the station, leaving other officers on the scene.

¶ 12   On cross-examination, Rehder testified that when he was speaking with Gloria, he did not note any visible injuries. When asked whether Gloria told him "that after the incident with [defendant], she returned to her bedroom," he answered, "I do believe so, yes."

¶ 13   Oak Lawn police officer Kevin Lackey testified that he was a member of the force's part-time special response team. On the morning in question, the 13-member team was called to respond to a domestic disturbance with a "barricaded subject" inside the home. The team arrived at the house just before 8 a.m. and assembled on the first floor, which had been cleared. Every 90 seconds to 2 minutes, a rotating team member announced their office and, while holding a shield, called commands up the stairs along the lines of, "[C]ome out with your hands up *** we're in your house, please come out with your hands up."

¶ 14   Eventually, members of the team climbed the stairs and opened the door at the top using a mirror. Some of the officers entered the upstairs room while continuing to call out commands. One officer brought his dog into the room, but because the dog was barking, it was brought back downstairs so that the officers were audible. Officers moved through the second floor, clearing a hallway, closets, and another room. At that point, the only space left to be cleared was a crawl space that was accessible through a closet.

¶ 15   The area was dark and cluttered, so Lackey "ported the wall" to make a hole that would allow the officers to look into the crawl space. When Lackey started hitting the wall, he heard someone screaming from inside the crawl space. Officers located a man, later determined to be defendant, inside the crawl space. He was placed into custody around 10:08 a.m.

¶ 16   On cross-examination, Lackey testified that the door at the top of the stairs was cracked open, and that none of the doors were locked or barricaded.

¶ 17    At the close of the State's case, defense counsel made a motion for a directed verdict. He argued that, even viewing the evidence in the light most favorable to the prosecution, the State had not met its burden of proving that defendant unlawfully restrained or abused Gloria. Counsel argued that the State's only evidence was Gloria's testimony, which was impeached by Rehder's testimony "at least with regard to whether she went to the bedroom or not or whether she told [him] she went to the bedroom." In addition, counsel asserted that Gloria's story was not credible and did not "add up," noting that she let the dog out even though she claimed she was not able to leave, and that she had a panic button that she could have used "at any time" but did not push for hours. In response, the State argued that Gloria testified credibly, that Rehder did not speak Spanish, and that Gloria's testimony was corroborated by Rehder's description of her when she ran out of the house and by the officers' discovery of the knife. The trial court denied the motion, finding that the State had presented evidence of every element of the offenses.

¶ 18    Defendant did not testify or present any evidence.

¶ 19    In closing, the State reviewed Gloria's testimony. The State argued, among other things, that before Gloria could summon the police with her panic button, she had to make sure defendant was asleep, and that she did so by letting her dog outside "waiting to see if he would wake up." The State also highlighted Rehder's testimony that, when he arrived at the house, Gloria ran to him, frantic, crying, and having trouble breathing. Further, the State argued that although officers called out defendant's name inside the house from about 6 a.m. to 10 a.m., he did not come out, and that he was hiding "because of what he had just done."

¶ 20    Defense counsel argued to the jurors that they could not believe Gloria "for a number of reasons." First, counsel argued that Gloria had no injuries, despite describing a brutal attack.

Second, counsel asserted it made no sense that Gloria had a panic button around her neck from the moment the incident started around 11:30 p.m. but did not press it until 5 a.m., and asserted she had offered no reason or explanation for her delayed action. Moreover, noting Rehder's testimony that he believed Gloria told him she went into her bedroom after the attack, counsel opined that she could have pushed the panic button there.

¶ 21 Third, counsel urged the jury not to believe Gloria because her demeanor in court was "straightforward and plain *** the kind of delivery you would expect of someone who was telling you a story instead of someone who was telling you something traumatic that happened to her." Relatedly, counsel argued that it did not "add up" that Gloria would have been hysterically crying six hours after the incident, especially when she could have left the house when she opened the door for her dog. Counsel also highlighted that Gloria testified she did not go to her bedroom after the attack, but Rehder testified that she told him she did. Counsel stressed that this impeachment was "important because it catches her *** making stories."

¶ 22 Finally, counsel argued to the jurors that, while they could draw an inference of consciousness of guilt from defendant's reluctance to come out of "the attic," there are many reasons people do not want to speak with the police. Counsel argued that it was logical for defendant not to be interested in talking to the police given that his mother was outside crying and "[e]ven if he doesn't know whatever his mom might be saying to them, that's not something that looks good for him."

¶ 23 In rebuttal, the State argued that Gloria did not lie or exaggerate in her testimony. The State asserted that Gloria waited until defendant fell asleep to press her panic button because she thought he was going to kill her, and because he was in control of her "from the word go." Regarding

Rehder's testimony that Gloria told him she went to her bedroom, the State noted that "this is *** a woman whose first language is Spanish talking to Officer Rehder whose first language is English," and asserted that Gloria testified truthfully and credibly. Finally, the State argued that the jury should infer a consciousness of guilt from defendant's act of hiding from the police for over four hours.

¶ 24 During deliberations, the jury sent a note with two questions to the court: "In regards to the aggravated unlawful restraint, because the defendant was not holding the knife the entire duration of the incident, would the detention start when he first held the knife to [Gloria]?" and "[D]oes the detention end when the knife was put down?" With the parties' agreement, the court answered with a note stating, "[Y]ou have heard the evidence and have been instructed on the law. Continue to deliberate." Just under an hour later, the jury returned a verdict of guilty on all three counts.

¶ 25 Defendant filed a motion to reconsider or for a new trial, arguing, in relevant part, that the evidence was insufficient to convict where Gloria's testimony was "contradicted by her demeanor, her complete lack of injuries, and reason," and "it made no logical sense" that Gloria did not push her panic button until hours after the incident. The trial court denied defendant's posttrial motion, noting the jury did not feel Gloria was a liar and neither did the court.

¶ 26 The trial court subsequently sentenced defendant to concurrent terms of five years in prison for aggravated unlawful restraint and five years in prison for aggravated battery, and merged the guilty finding for domestic battery. Defendant filed a timely notice of appeal.

¶ 27 On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt where its case relied entirely on Gloria's incredible and impeached testimony.

¶ 28    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). The testimony of a single witness, if positive and credible, is sufficient to convict. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). A reviewing court will not reverse a conviction simply because a defendant claims that a witness was not credible. *Id.* Rather, reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 29    In order to sustain defendant's conviction for aggravated unlawful restraint, the State was required to prove that he knowingly without legal authority detained Gloria while using a deadly weapon. 720 ILCS 5/10-3(a), 10-3.1(a) (West 2022). In order to sustain his conviction for aggravated battery, the State was required to prove that he knowingly without legal justification by any means made physical contact of an insulting or provoking nature to Gloria, knowing she was a person 60 years of age or older. 720 ILCS 5/12-3(a)(2), 12-3.05(d)(1) (West 2022).

¶ 30    Viewing the evidence in the light most favorable to the State, the evidence was sufficient to prove defendant guilty of both offenses. Gloria testified that she told defendant she was 67 years old at the time of the offense. Her testimony that he threw and hit her with a bottle, hit her in the face with his open hand, threw her to the ground, kicked her, and then picked her up by her hair

establishes the elements of aggravated battery. Her further testimony that defendant next put a knife to her chest, threatened to kill her, directed her to sit on a couch, and told her she could not go to the bathroom or move because "he was the one who said what to do" establishes the elements of aggravated unlawful restraint.

¶ 31    Defendant acknowledges that the testimony of a single witness, if positive and credible, is sufficient to convict. *See Siguenza-Brito*, 235 Ill. 2d at 228. He contends, however, that his convictions should be reversed because Gloria's testimony was incredible and impeached. He contends no rational juror could have found him guilty beyond a reasonable doubt because Gloria's "story is absurd," was not corroborated by any direct evidence, and was impeached by Officer Rehder's testimony. Defendant presents his challenge to Gloria's testimony in four parts.

¶ 32    First, defendant argues that Gloria's story "makes no sense" because she did not press the panic button hanging around her neck until more than five hours after the alleged violent incident. Defendant acknowledges that Gloria testified she was waiting for him to fall asleep. However, he notes that she also testified she knew the police could not call her in response to her pressing the button—thus alerting him that she had called—because her phone was broken. Therefore, defendant argues, her failure to press the panic button earlier makes no sense and undermines her credibility.

¶ 33    Second, defendant argues that being struck repeatedly in the face, thrown to the floor, and kicked in the stomach would leave evidence of injury, especially on an "elderly woman." However, he notes, Gloria did not seek any medical care, no injuries were photographed, and Rehder did not note any visible injuries on her body. Defendant concedes that lack of injury is not dispositive but

nevertheless maintains that the lack of any evidence corroborating the various alleged attacks on Gloria further weakens her credibility.

¶ 34     Third, defendant argues that although Gloria testified that she stayed in the living room and did not go to her bedroom after defendant broke her phone, Rehder told jurors "just the opposite." This inconsistency, defendant asserts, fatally undermines Gloria's credibility and calls into question her testimony that he told her she could not leave the living room. He argues that it makes no sense that she did not press the panic button when she was in another room.

¶ 35     Fourth, defendant notes Gloria testified that the entire incident started when he threw a beer bottle at her back and the bottle broke. Defendant argues that there are two "glaring issues" with this testimony: (a) Gloria did not explain why he would have been motivated to throw a bottle at her or imply he had done anything similar to her before; and (b) photos taken of the scene do not show any broken bottle or glass. Defendant maintains that Gloria's failure to offer a motive and the lack of corroborating physical evidence of broken glass further undermine her credibility and create reasonable doubt.

¶ 36     Given that these arguments involve matters of credibility that are for the jury to resolve in its role as trier of fact (see *People v. Tenney*, 205 Ill. 2d 411, 428 (2002)), defendant essentially asks this court to substitute its judgment for that of the jury. This we cannot do, as it is the task of the trier of fact to determine when a witness testified truthfully and to decide how flaws in any part of the testimony affect the credibility of the whole. *People v. Gray*, 2017 IL 120958, ¶ 47. The trier of fact may accept or reject "as much or as little" of a witness's testimony as it likes. *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 46. As noted, the trier of fact assesses the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence,

and resolves conflicts or inconsistencies in the evidence. *Id.*; *Brooks*, 187 Ill. 2d at 131. This court will not substitute its judgment for that of the trier of fact on these matters and we will not reverse a conviction simply because a defendant claims that a witness was not credible. *Siguenza-Brito*, 235 Ill. 2d at 228; *Brooks*, 187 Ill. 2d at 131.

¶ 37    The jury saw and heard Gloria testify and was well aware of defendant's position that she was incredible. Other than the arguments related to the beer bottle, defense counsel presented each of defendant's current credibility arguments to the jury. In opening statements, defense counsel asked the jurors to pay attention to whether Gloria's testimony "make[s] any sense," specifying that Gloria would not testify to having sustained any visible injuries or having sought medical care, and would testify that she was wearing a panic button around her neck throughout the entire incident but did not press it for several hours after she was allegedly attacked.

¶ 38    Then, in closing, defense counsel argued to the jurors that they could not believe Gloria "for a number of reasons," including that she had no injuries, did not press the panic button until 5 a.m., and could have pushed the button in the bedroom where she told Rehder she went after the attack. Counsel also stressed that while Gloria testified she did not go to her bedroom after the attack, Rehder testified that she told him she did, and that this impeachment was "important because it catches her *** making stories."

¶ 39    Despite these arguments, the jury found defendant guilty, necessarily finding Gloria credible as to the material questions in the case. The jury heard and saw Gloria testify and was in a much better position than this court to determine her credibility. *Siguenza-Brito*, 235 Ill. 2d at 22. As to the beer bottle, there was no reason for the State to elicit testimony from Gloria relating to defendant's motive for throwing it at her, and the absence of a picture of broken glass only

establishes that an evidence technician did not photograph any. We cannot find that the alleged flaws defendant has identified in Gloria's testimony necessarily destroyed her credibility, and we will not substitute our judgment for that of the jury on the question of Gloria's credibility. See *Gray*, 2017 IL 120958, ¶ 47; *Brooks*, 187 Ill. 2d at 131.

¶ 40    As a final matter, we are mindful of defendant's argument that his act of hiding from the police in his own home does not constitute evidence of consciousness of guilt. He maintains that, when police "stormed his house" around 5 a.m., it would have been eminently reasonable for him to fear the police and seek refuge in his home. He asserts that the police shouted commands up the stairwell at him, after which the special response team "riotously bombarded the stairwell with a barking police dog," yelling out commands while holding a shield, and "blowing" a hole in the wall. In these circumstances, defendant argues, his act of hiding in a crawl space was just as likely evidence that he was terrified of the tense situation unfolding in his home, that he was scared of barking dogs, or that he was nervous around police as a Latino man. He maintains that, even if a juror concluded that hiding from the police may suggest consciousness of guilt, this court should find that inference unreasonable.

¶ 41    This court and our supreme court have repeatedly held that hiding from or otherwise attempting to evade the police are circumstances from which a trier of fact may infer consciousness of guilt. See, *e.g.*, *People v. Harris*, 225 Ill. 2d 1, 23 (2007); *People v. Hart*, 214 Ill. 2d 490, 518-19 (2005); *People v. Harris*, 2023 IL App (1st) 210754, ¶ 78; *People v. Davis*, 2023 IL App (1st) 220231, ¶ 42; *People v. Pursley*, 284 Ill. App. 3d 597, 606 (1996). We decline defendant's invitation, which he based on a special concurrence, a law review article, and opinions from other jurisdictions, to abandon "the very idea of consciousness of guilt."

¶ 42    After reviewing the evidence in the light most favorable to the prosecution, as we must, we find that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. The evidence is not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to defendant's guilt. *Slim*, 127 Ill. 2d at 307. Accordingly, defendant's challenge to the sufficiency of the evidence fails.

¶ 43    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 44    Affirmed.