2021 IL App (1st) 182539-U

No. 1-18-2539

Order filed June 23, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 5668 |
| | ) | |
| THOMAS WARNER, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence presented at trial was sufficient to support defendant's convictions for two counts of aggravated battery with a firearm and one count of aggravated discharge of a firearm. Defendant's sentences for aggravated battery with a firearm are not excessive.

¶ 2    Following a bench trial, defendant Thomas Warner was convicted of two counts of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)) and one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2014)). The trial court sentenced

defendant to consecutive terms of 12, 8, and 4 years in prison, respectively. On appeal, defendant contends that his convictions should be reversed because the State's eyewitnesses were inconsistent, unreliable, and rebutted by the alibi testimony of his own witness. He further contends that his sentences for aggravated battery with a firearm are excessive in light of his minimal criminal background and significant support from his family. For the reasons that follow, we affirm.

¶ 3    Defendant's convictions arose from the events of January 1, 2016. Following his arrest, defendant was charged by indictment with 10 counts of attempted first degree murder, two counts of aggravated battery with a firearm, and one count of aggravated discharge of a firearm. The State proceeded to trial on all counts.

¶ 4    At trial, Brandon Collier testified that on the night in question, he was at his friend Jacari Turner's house for a New Year's Eve party. Collier drank two "shots" at the end of the midnight countdown, but his consumption of alcohol did not impair his ability to recall the evening. At some point, Collier, Turner, Julius Freeman, and three other men left Turner's house to go to another party, on the 9800 block of South Beverly Boulevard.[1] They arrived at the party and went inside around 2 a.m. However, the group decided to leave after six or seven minutes because there were no women at the party.

¶ 5    Collier testified that when he and his group approached the front door, six or seven men tried to block their exit. Collier and his group were able to get outside and started walking toward their cars, which were parked across the street. A man, whom Collier identified in court as

---

[1] Initially, the prosecutor stated that the address of the second party was 9807 South Beverly. Later, the prosecutor asked Collier whether the address was 9824 South Beverly, and Collier answered, "Yeah, something like that."

defendant, asked Collier if he wanted to buy some Xanax, but Collier declined. Collier recalled that defendant had red dreadlocks and tattoos on his face. Although it was dark out, there were streetlights and the area was well-lit. Collier and his group continued toward their cars. Freeman got into the front passenger seat of Collier's car and Collier sat down in the driver's seat. As Collier started to close his door, defendant grabbed it. Collier slammed his door closed. Turner was "right behind" Collier but had not entered the car.

¶ 6     Defendant, who was less than a foot from Collier, pulled out a silver semiautomatic handgun, pointed it at Collier, and started firing into the car. Collier saw glass shatter and estimated that defendant fired 10 to 12 shots. Collier moved to the car's back set to avoid the gunshots. He saw Freeman fall out of the car to the ground. When the shooting stopped, Collier saw defendant flee on foot and heard Freeman screaming for help. Collier got out the car and ran around to the passenger side, where he saw that Freeman had been shot. Collier had difficulty picking Freeman up and realized he had been shot as well, in the hand. Eventually, Collier moved Freeman into the car and drove to the hospital. Collier did not know where Turner went.

¶ 7     While Collier was in the emergency room, he was interviewed by a police officer. Collier told the officer what happened and gave a description of the shooter. At some point, Collier had surgery on his right hand. In the course of his treatment, Collier learned that a bullet had shattered his right wrist, and he had a plate inserted in his wrist with 13 screws. On January 3, 2016, a detective came to Collier's hospital room and showed him a photo array. Collier identified defendant as the shooter and was video recorded while doing so. Collier remained in the hospital until January 5, 2016.

¶ 8    On cross-examination, Collier stated that he did not remember the exact time he and his group arrived at the party on South Beverly. However, he did recall telling a detective on January 1, 2016, that they arrived between 1 and 1:30 a.m. Collier did not remember whether he told the detective that they stayed at the party for 30 minutes, that five to seven men tried to prevent them from leaving, that defendant had a black semiautomatic handgun, or that defendant fired four to five shots. Collier clarified that when defendant started shooting, Turner was "getting ready to get in [Collier's] car" but then "took off running." However, Collier did not remember whether he told the detective that Turner was at the car's back door when the shooting started.

¶ 9    Collier did not remember telling the detective or a responding officer at the hospital that the shooter had red dreadlocks with blond tips. Collier reiterated that at the time of the shooting, defendant had tattoos on his face. However, he stated that he could not describe the shape or location of the tattoos. Collier stated twice that he "got a good look" at defendant, but also said that he "didn't look at him for long because I'm getting shot at." He denied ever having looked at defendant's Facebook page. He agreed that he took pain medications at the hospital.

¶ 10   On redirect, Collier stated that on the night of the shooting, he was wearing about $5000 worth of jewelry, including three chains that were visible. He stated that when he was shown the photo array at the hospital, he was "a hundred percent" sure of his identification of defendant as the shooter. He was also "a hundred percent" sure of his in-court identification.

¶ 11   Julius Freeman testified that on the night in question, he was at a party with Collier and Turner. At some point, they and several other people went to a second party, on the 9800 block of South Beverly.[2] However, they decided to leave the second party after three or four minutes

---

[2] The prosecutor recited the address of the second party as 9824 South Beverly.

because, other than one woman, the party was attended just by men. As the group left, the front door was "getting blocked off," so Freeman and his group had to "swim" through the crowd. As they were doing so, Freeman "felt [his] pockets get touched twice."

¶ 12    Once outside, Freeman saw Collier talking to defendant, whom he identified in court. Freeman noticed that defendant had red dreadlocks. Collier unlocked his car, and Freeman got into the front passenger seat. After Collier sat down in the driver's seat, Freeman saw Collier and defendant "having a little tussle with the door." Defendant was pulling on the door, standing over Collier and trying to "snatch his chain or *** just reach in." Collier slammed the door shut and three seconds later, Freeman heard gunfire. He bent down and saw that Collier's right hand had been shot. Through the car's back window, Freeman saw defendant holding a gun. Defendant shot into the car five times, causing glass to shatter. Freeman was hit twice: once below his left shoulder blade, and once in his ribcage, underneath his left armpit.

¶ 13    Freeman opened his car door and "jumped" to the ground. About 10 to 15 seconds later, after the shooting stopped, Collier picked Freeman up from the ground, put him back in the car, and drove to the hospital. Freeman passed out during the drive but recalled pulling up to the hospital, where he had surgery. Later, he learned that one of the bullets was not removed from his body. On January 3, 2016, a detective came to Freeman's hospital room and showed him a photo array. Freeman identified defendant as the shooter and was video recorded as he made the identification. He remained in the hospital for about a month.

¶ 14    On cross-examination, Freeman stated that in addition to the red dreadlocks, what "stood out" about the shooter was that he had facial tattoos. However, Freeman did not remember what the tattoos looked like and did not remember describing them to the police. He acknowledged

having drunk two shots of alcohol at midnight. He estimated that his group left for the party on South Beverly around 1:40 or 1:50 a.m., but did not remember what time they arrived.[3] He did not remember telling the police that his pockets "got touched" while he was leaving the party, that defendant reached in the car and tried to snatch Collier's chain, or that he did not see a gun. Freeman agreed that he did not know where Turner was during the shooting and did not see where defendant went after the shooting. Freeman denied having viewed defendant's Facebook page prior to viewing the photo array and stated that he did not remember telling a detective or an Assistant State's Attorney that he had done so.

¶ 15    The parties stipulated that Freeman told the Assistant State's Attorney that: the police showed him the photo array before he saw pictures of defendant on Facebook; a couple of weeks into his hospital stay, he saw a picture on Facebook depicting defendant standing in front of the house on South Beverly; and defendant's Facebook page was deactivated a week later. The parties further stipulated that Freeman told the Assistant State's Attorney that he was on a morphine drip and drowsy when he spoke to the detective.

¶ 16    On re-direct, Freeman reiterated that he had not seen a Facebook photo of defendant before viewing the photo array. He also stated that he was one "[h]undred percent sure" that defendant was the person who shot him.

¶ 17    Jacari Turner testified that on the night in question, he had gathered at his aunt's house with Collier, Freeman, and a few other friends. At midnight they drank a toast of champagne. Around 1:30 or 1:45 a.m., the group left to go to a party at the residence of a high school classmate

---

[3] Defense counsel asked Freeman whether they parked at approximately 9807 South Beverly, and Freeman answered affirmatively.

of Turner's in the 9800 block of South Beverly.[4] When they went inside the house, Turner recognized several people from school. He also saw defendant, who had "red dreads." Turner had not met defendant before, and identified him in court. After being at the party for less than 10 minutes, the group decided to leave because there were "too many dudes" there.

¶ 18    While Turner was walking toward Collier's car with Collier and Freeman, he noticed defendant was walking in the same direction. Freeman got into the front passenger seat of the car, which was parked across the street from the house and "up the street some." As Collier got into the driver's seat and Turner got into the back seat on the driver's side, defendant appeared at the driver's door and pulled on it. Collier, who was wearing three chains, closed the door. As soon as the door closed, defendant pulled out a small silver gun and started shooting into the driver's side window. Turner, who had not yet closed the car's back door, jumped out of the car and ran from the scene. He estimated that he heard five or six shots total. Turner called for a ride, got dropped off at his aunt's house, and drove to the hospital.

¶ 19    On January 3, 2016, the police came to Turner's aunt's house and he told them what happened the night of the shooting. He also identified defendant as the shooter in a photo array. In court, Turner viewed two photographs, marked as People's Exhibits No. 37 and 38. He stated that he recognized defendant in the photographs and that they showed how defendant's face and hairstyle, "red dreads," appeared on the night of the shooting.

¶ 20    On cross-examination, Turner explained that he called Collier before Collier got to the hospital, and talked with him about what happened. Later that day, he visited Collier and Freeman

---

[4] Turner answered affirmatively when the prosecutor asked whether the party was located at 9824 South Beverly.

in the hospital. Turner denied viewing defendant's Facebook page, and denied giving defendant's name to the police or to Freeman's mother. He stated that on January 3, 2016, he told the police that the shooter had red dreadlocks, but agreed that he did not tell the police about any tattoos.

¶ 21    Chicago police evidence technician Glenn Manguerra testified that he processed the scene of the shooting. At the scene, he observed shell casings, droplets of blood, and broken glass on the street. Manguerra took photographs of the scene and recovered five shell casings from the street. He then went to the hospital parking lot, where he observed the car associated with the incident. He noted that the windows on the driver's side were shattered, that there were bullet holes on the driver's side, and that there were suspect blood stains on the exterior of both sides of the car. Inside the car, he noted broken glass, suspect blood stains on the front and back seats, and bullet holes in the driver's headrest. He photographed the vehicle and recovered a fired bullet fragment from the headrest.

¶ 22    Chicago police officer James Beavers testified that about 2:50 a.m. on the day in question, he spoke with Collier as he was being treated for a gunshot wound in the emergency room. Collier described his shooter as a light-skinned or light-complexioned Black man, 5' 11" tall, approximately 250 to 300 pounds, with a tattoo on his face and "blond strawberry colored dreadlocks." Beavers sent a flash message to other officers to canvass the area. On cross-examination, Beavers stated that Collier told him the shooting occurred at approximately 2:04 a.m., and that Collier did not describe the shooter's tattoo and did not give an indication as to the length of the shooter's dreadlocks. On re-direct, Beavers added that Collier stated the shooter was 21 to 25 years old.

¶ 23   Chicago police detective Roxana Hopps testified that she was assigned to investigate the shooting about 3:30 a.m. on January 1, 2016. She spoke with the responding officer, surveyed the scene at 9807 South Beverly, and then went to the hospital. There, she spoke with Collier in the emergency room. Freeman was in surgery, so she ended her shift and anticipated talking with him the next day. On January 2, 2016, Hopps received a phone call from Freeman's mother, who gave her defendant's name.

¶ 24   On January 3, 2016, Hopps interviewed Freeman at the hospital. Freeman informed Hopps that he had seen "a Facebook picture" of defendant. Hopps and another detective then showed Freeman a photo array that contained an image of defendant. Hopps explained that she went ahead with the photo array "because the incident had just happened" and "Collier had given a really good description" of the shooter. She did not view the Facebook photo Freeman had referenced. Freeman identified defendant in the photo array.

¶ 25   Next, the detectives showed a photo array to Collier, who was still at the hospital. He also identified defendant in the photo array. Thereafter, the detectives went to Turner's residence, where Turner viewed a photo array and identified defendant as the shooter.

¶ 26   On cross-examination, Hopps agreed that Freeman's mother reported that Turner had given her defendant's name. Hopps also agreed that the photo array was created "based off" having learned defendant's name. When Hopps spoke with Collier in the emergency room on January 1, 2016, he told her that he stayed at the party for about 30 minutes, that the shooter had "red dreads with blonde tips," and that the shooter had a black semiautomatic handgun. On January 3, 2016, Collier indicated to Hopps that he had viewed a picture of defendant on Facebook. Collier did not tell Hopps during either conversation that people tried to prevent him from leaving the party.

Hopps agreed that Freeman never told her that people near the front door were touching his pockets or that defendant grabbed at Collier's chain. Freeman told Hopps that he never actually saw the firearm. Hopps recalled that Freeman described the shooter as having dreads, but she did not recall if he identified what color they were. Freeman told Hopps that Turner told him defendant's name.

¶ 27    On redirect examination, Hopps testified that her investigation did not reveal that Turner had seen a Facebook photo of defendant before he made his identification. Turner told her that while at the party, he heard defendant being called "Thomas."

¶ 28    The parties stipulated that if called as a witness, Chicago police detective Wade Golab would have testified that he acted as an independent administrator during the administration of the photo arrays to Collier, Freeman, and Turner. The video recordings of Collier's and Freeman's identifications were entered into evidence as exhibits, which the trial court viewed in chambers. The parties stipulated that an expert in firearms identification would have testified that the five cartridge cases recovered at the scene were fired from the same firearm.

¶ 29    On defendant's behalf, Jocelyn Solomon testified that she had been in a romantic relationship with defendant from about October 2015 to September 2016, and that they were still friends. On the night in question, she stayed home because she had been unable to get her hair done. Defendant came to her apartment, on the 1800 block of East 73rd Street, sometime between 12:30 and 2 a.m., and stayed until about 7 or 8 p.m. He did not leave her apartment during this time. Solomon identified two photographs, marked as People's Exhibits No. 37 and 38, as pictures she took of herself and defendant that night. According to Solomon, at the time, defendant had one tattoo on his face, and also had tattoos on his neck, hands, and arms. She also stated that at the time, defendant's Facebook page had pictures of him with red dreadlocks.

¶ 30    On cross-examination, Solomon specified that defendant came to her apartment at 2 a.m. She remembered the time because she had been watching a television program that ended at that time, and defendant arrived "right between the commercials and before the other program started." She did not believe he was under the influence of Xanax. Her phone, which she had used to take the pictures of herself with defendant, indicated that the photographs were taken around 5 a.m. Solomon estimated that it would take about 25 to 30 minutes to get from her residence to West 99th Street and South Beverly Boulevard. She acknowledged that she and defendant spoke on the phone while he was in jail and talked about his case.

¶ 31    On redirect examination, Soloman testified that she was aware defendant had a new girlfriend. She also stated that defendant had never asked her to lie for him.

¶ 32    In rebuttal, the State called Chicago police detective Christopher Tenton, who testified that he interviewed defendant on March 24, 2017. Defendant initially told Tenton that he did not recall the events of January 1, 2016, because he was a heavy drug user during that time frame and was "doing a lot of Xanax." Later in the interview, defendant said he was with two women on the night in question and they engaged in a "threesome." Defendant did not say he was with Solomon.

¶ 33    The trial court found defendant not guilty of attempted first degree murder (counts I through X), but guilty of aggravated battery with a firearm as to Collier (count XI), aggravated battery with a firearm as to Freeman (count XII), and aggravated discharge of a firearm as to Turner (count XIII). In announcing its findings, the court first summarized the witnesses' testimony. It then noted that one of the "key issues" raised by the defense was Collier's and Freeman's viewing of Facebook photographs of defendant. The court characterized the testimony on this topic as "muddled" and stated it was curious as to why Detective Hopps seemed

disinterested in the issue. However, it concluded that it could not tell from the record if the Facebook pictures had "any impact" on the identifications made by Collier and Freeman, and concluded there was no evidence that the identifications were tainted.

¶ 34 The court noted that there were some inconsistencies in Collier's and Freeman's descriptions of the initial gathering, but found that the "sum and substance" of their testimony was consistent. The court also stated that the witnesses' failure to mention a beard in their descriptions of the shooter was not fatal to the State's case and did not undercut their identifications.

¶ 35 The court found Solomon to be credible in her testimony that defendant was at her residence in the early morning hours of January 1, 2016. However, the court did not find her to be an alibi for the relevant time period. The court explained that defendant "certainly could have been out at the 9800 block of South Beverly and still made it over to Ms. Solomon's house, as she testified to." The court found that defendant's statement to Detective Tenton was unreliable, and did not consider it.

¶ 36 Defendant filed a posttrial motion and an amended posttrial motion. In presenting the motion, defense counsel argued, among other things, that Solomon's testimony did provide an alibi, as Collier and Freeman placed themselves "still on the scene" at 2 a.m., and Solomon testified that it would take about 25 to 30 minutes to get to her residence from the scene of the shooting and defendant arrived right as a television show was ending at 2 a.m. The trial court denied the motion, finding, in part, that Solomon's testimony "didn't establish an alibi of sorts as far as her testimony did not undercut the State's theory of the case, nor place [defendant] in a spot where he could not have been to—where he could have been so it would have been impossible for him to have been the shooter."

¶ 37    A presentence investigation (PSI) report was prepared. The report indicated that defendant's criminal history consisted solely of three juvenile adjudications: for aggravated battery in 2010, criminal trespass to land in 2012, and theft in 2012. Defendant reported to the probation officer that he had a normal childhood and maintains a relationship with his mother and brother. His parents separated before he was born, he was raised by his mother, and his father was never a part of his life. Defendant was expelled from high school during his sophomore year and, despite attending three alternative schools, had not graduated. He expressed interest in earning a GED in the future.

¶ 38    Prior to incarceration, defendant lived with and was supported by his aunt. He did not have any income, but also did not have any financial obligations. He was single and had no children. Defendant reported that he had no association with street gangs. However, the probation officer noted that the Chicago Police Department's "CLEAR" system indicated defendant was involved in gang activity and was a member of the Mickey Cobras gang. Defendant reported no health problems other than asthma, and stated that he had never been treated by a mental health professional.

¶ 39    Defendant reported using alcohol on a social basis, starting at age 19. He began using marijuana and Ecstasy pills at age 18. He would smoke up to two blunts of marijuana on a daily basis and would take up to two Ecstasy pills on a weekly basis. He denied using any other illegal drugs or having been evaluated or treated for drug abuse.

¶ 40    In aggravation, Collier read a victim impact statement in which he stated that defendant tried to take away his life, and that as a result of being shot, he has to live with plates and screws inside his arm. He stated that during his recovery, he lost his job, his car, and his apartment, and

had to drop out of school. As a result, he had a "repossession" and an eviction on his record, which affected his ability to get approved for loans and find an apartment. Collier related that he could not care for his infant daughter during his recovery and instead, his family had to take care of him. Freeman also read a victim impact statement. He stated that as a result of being shot, he had to learn how to walk again. He could not sit up, had to "use the bathroom through a bottle," and his job was in jeopardy.

¶ 41 In mitigation, defendant's aunt, Jimia Walker, read a letter stating that defendant did not have a father figure in his life, and that when his uncle passed away, it left defendant feeling hopeless and unsure of his place in the world. She asked that the court consider defendant's age and circumstances, and provide him with an opportunity to right his wrong. Walker stated that if given a second chance, defendant would be given proper guidance and support to ensure a smooth transition, as she would personally invest in keeping him "on track" when released from custody. She further stated that defendant now had a support system that had not been in place while he was growing up, and she asked for rehabilitation.

¶ 42 Defendant's mother, Andrea Johnson, testified that she had health problems and defendant took care of her. She stated that defendant was "not a bad person," but rather, had always been caring. She further stated that defendant was respectful and had the support of his family.

¶ 43 Following Johnson's testimony, defense counsel tendered to the court a collection of emails and letters, which the court stated it had read and would consider. Among the collection was an unsigned email from a cousin, stating that defendant was a "caring, protective individual of his family"; an email from defendant's aunt, Deatria Johnson, stating that defendant "comes from a loving home with massive support" and "is a great young man with lots of potential"; an email

from defendant's aunt, Valerie Mays, stating that defendant "is a momma's boy and very sensitive"; an email from defendant's aunt, Tornnetta Walker, stating that defendant is nurturing and caring and a trusted babysitter within the extended family; and a letter from Pastor Josh London of the Shut-Up Prison Ministry, stating that defendant has a positive outlook, takes responsibility for his actions, and learns from his mistakes.

¶ 44    The State argued that based on the facts of the case, defendant should be sentenced "somewhere in the 30s." Defense counsel stressed that defendant was young and had the support of his family, and asked for a minimum sentence. Counsel argued that the letters presented on defendant's behalf showed "the environment that [defendant] would be returning to, that supportive environment." In allocution, defendant stated, "I just hope you give me a second chance at life. That's it."

¶ 45    The court found that Collier and Freeman had both suffered severe bodily injury, which mandated consecutive sentences, and sentenced defendant to consecutive terms of 12, 8, and 4 years in prison. In the course of announcing sentence, the court stated it had considered the facts of the case and had reviewed the PSI report, the letters submitted by the defense in mitigation, and the victim impact statements. The court further stated that it had considered the parties' arguments, defendant's statement in allocution, and the statutory factors in aggravation and mitigation.

¶ 46    The court stated that in mitigation, it had considered defendant's strong family and community support and lack of criminal history. The court further noted that defendant was raised by a single mother and that his father was not involved in his life. But the court also remarked that "this is an extraordinarily violent offense" and that it was only by "the grace of fortune" that no

one died. The court characterized the offense as a tragedy, not only for the victims, but also for defendant and his family.

¶ 47    Defendant filed a motion to reconsider sentence, which the trial court denied.

¶ 48    On appeal, defendant first challenges the sufficiency of the evidence to sustain his convictions. When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). A reviewing court will not reverse a conviction simply because the defendant claims that a witness was not credible. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Rather, reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 49    Defendant was convicted of two counts of aggravated battery with a firearm, which required the State to prove that he knowingly "[d]ischarg[ed] a firearm *** and cause[d] any injury to another person" (720 ILCS 5/12-3.05(e)(1) (West 2014)), and one count of aggravated discharge of a firearm in the direction of another person, which required the State to prove that he "knowingly or intentionally *** [d]ischarg[ed] a firearm in the direction of another person ***." 720 ILCS 5/24-1.2(a)(2) (West 2014).

¶ 50    In this court, defendant does not dispute the elements of either offense. Rather, he argues that his convictions should be reversed because the State's witnesses were incredible where they were inconsistent, unreliable, and rebutted in regards to their identification of him as the shooter. The State counters that the evidence was sufficient to convict. Among other things, the State contends that the victims' identification testimony was reliable based on the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972). In his reply brief, defendant asserts that the State, by initiating a discussion of the *Biggers* factors, "does not engage with [defendant's] argument," which he reiterates is that the State's witnesses were not credible.

¶ 51    That said, we initially note that defendant's arguments involve matters of credibility that are for the trial court to resolve in its role as trier of fact. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). As mentioned, it is the trier of fact who assesses the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence, and who resolves conflicts or inconsistencies in the evidence. *Id.*; *Brooks*, 187 Ill. 2d at 131. This court will not substitute its judgment for that of the trier of fact on these matters and we will not reverse a conviction simply because defendant claims that a witness was not credible. *Brooks*, 187 Ill. 2d at 131; *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 52    After reviewing the evidence in the light most favorable to the State, we find that a rational trier of fact could conclude that defendant committed the offenses of aggravated battery with a firearm as to Collier and Freeman and aggravated discharge of a firearm in the direction of Turner. At trial, all three eyewitnesses testified consistently regarding the sequence of events during the shooting. All three witnesses explained that, shortly before the shooting, defendant pulled on the driver's door and then, after Collier shut it, pulled out a gun and fired it into the car multiple times.

All three eyewitnesses placed Collier and Freeman inside the car during the shooting, and Turner testified that he was in the back seat but had not yet shut his door. There is no dispute that Collier and Freeman suffered gunshot wounds, and all three eyewitnesses identified defendant in a photo array shortly after the shooting and at trial. While no physical evidence linked defendant to the shooting, credible eyewitness testimony alone is sufficient to sustain a conviction. *People v. Daheya*, 2013 IL App (1st) 122333, ¶ 76. Here, the eyewitness testimony, and the reasonable inferences therefrom, was sufficient to sustain defendant's convictions. Stated differently, the evidence presented was not so unsatisfactory, improbable, or implausible such that it raises a reasonable doubt as to defendant's guilt. See *Slim*, 127 Ill. 2d at 307.

¶ 53    Defendant nevertheless contends that Collier, Freeman, and Turner were not credible witnesses for several reasons. First, he argues that they were inconsistent in their accounting of events. Specifically, he argues that Collier, Freeman, and Turner could not agree on the address of the party or the time when they arrived, and notes that they did not report certain details to the police, such as that a group of men tried to prevent them from leaving the party and that people touched Freeman's pockets while they were exiting. In addition, defendant observes that only Turner claimed defendant was inside at the party and that only Freeman stated defendant appeared to try to "snatch" a chain from Collier's neck. Second, defendant argues that the eyewitnesses' initial descriptions of the shooter varied significantly from how defendant looked on the night in question. In particular, he points out that the photographs taken by Solomon show him with a full beard and "deep red dread locks without blonde tips," but that none of the witnesses described the shooter as bearded and Collier initially told Officer Beaver and Detective Hopps that the shooter had "blond strawberry" dreadlocks or red dreadlocks with "blonde tips." Finally, defendant asserts

that Collier and Freeman undermined their credibility when they lied on the stand about not viewing defendant's Facebook profile prior to identifying him in a photo array, and that all three eyewitnesses' credibility was damaged because they knew defendant's name prior to viewing the array.

¶ 54    Here, the trial court heard Collier, Freeman, and Turner testify and was well aware both of defendant's position that they were incredible and of the complained-of inconsistencies in their testimony. When presenting the motion for a directed finding, defense counsel argued that the eyewitnesses contradicted each other in numerous ways, including regarding what time they arrived at the party, and that they did not relate certain details to the police, including that some people near the front door tried to prevent them from leaving. Counsel also argued that Collier and Freeman had viewed photos of defendant on Facebook, that Collier's description of the shooter included "blondish-red dreads" or "red dreads with blond tips," and that no one described the shooter as having a beard. Then, in closing arguments, defense counsel adopted his earlier arguments, added an assertion that only Freeman mentioned the shooter had grabbed at Collier's chains, and maintained that all three eyewitnesses had "improper source memory" when making their identifications because they had viewed Facebook photos of defendant. In arguing the posttrial motion, counsel reiterated his assertion that Collier, Freeman, and Turner were inconsistent in their descriptions of the shooter, the timeline, and "certain crucial parts of that evening."

¶ 55    Despite these arguments, the trial court found defendant guilty, noting that the "sum and substance" of the eyewitnesses' testimony was consistent, despite some inconsistencies in their descriptions of the initial gathering and their failure to mention that the shooter had a beard. The

court also found there was no evidence that the identifications of defendant were tainted by the Facebook photos. In denying the posttrial motion, the court stated, "I believe the complaining witnesses and I acknowledge that there were some instances where there were some issues in their testimonies, but the totality of everything that I heard and saw during the bench trial, I did find that the State met its burden of proof." Contradictory testimony does not necessarily destroy the credibility of a witness. *People v. Gray*, 2017 IL 120958, ¶ 47. Rather, it is the task of the trier of fact to determine when a witness testified truthfully and to decide how flaws in any part of the testimony affect the credibility of the whole. *Id.* Moreover, minor discrepancies in testimony only affect the weight of that testimony, and where inconsistencies relate to collateral matters, they do not automatically render a witness's testimony as to material questions incredible or improbable. *Id.* Here, the record does not establish that the inconsistencies and infirmities alleged by defendant render the whole of Collier's, Freeman's and Turner's testimonies unworthy of belief. See *id.* As such, we will not substitute our judgment for that of the trial court on this question of credibility. *Brooks*, 187 Ill. 2d at 131.

¶ 56 We are mindful of defendant's argument that the State's witnesses were rebutted by Solomon, who he asserts presented an alibi, was unimpeached, and provided photographs supporting her account of events. Defendant argues that Solomon had no motive to testify falsely for him, as their relationship "was over." Defendant acknowledges that the trial court did not consider Solomon to be an alibi witness, but opines that the court's "reasoning in this regard was flawed."

¶ 57 As the trier of fact, the trial court was free to accept or reject "as much or as little" of Solomon's testimony as it liked. See *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 46. Here, the

trial court found Solomon credible in that it believed her testimony that defendant was at her residence in the early morning hours of January 1, 2016. However, it apparently rejected her testimony that defendant arrived at her home just as the television show she was watching ended at 2 a.m. This was its prerogative in its role as trier of fact. See *id.* Viewing the evidence in the light most favorable to the prosecution, we cannot say that this credibility determination was unreasonable. See *People v. Cunningham*, 212 Ill. 2d 274, 279-80 (2004). We reject defendant's suggestion that Solomon's testimony warrants reversal of his convictions.

¶ 58    Defendant's second contention on appeal is that his 12- and 8-year sentences for aggravated battery with a firearm are excessive.

¶ 59    A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Sentencing decisions are entitled to great deference on appeal because the trial court is in a superior position to fashion an appropriate sentence based on firsthand consideration of the relevant sentencing factors, including the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). Although the trial court's consideration of mitigating factors is required, it has no obligation to recite each factor and the weight it is given. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 60    In reviewing a defendant's sentence, this court will not reweigh the aggravating and mitigating factors and substitute our judgment for that of the trial court merely because we would

have weighed these factors differently. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. A sentencing determination will not be disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). Sentences that fall within the permissible statutory range may be deemed to be the result of an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

¶ 61     Here, we find that the trial court did not abuse its discretion in sentencing defendant to 12 and 8 years' imprisonment for aggravated battery with a firearm. Aggravated battery with a firearm, as charged here, is a Class X felony (720 ILCS 5/12-3.05(e)(1), (h) (West 2014)) with an applicable sentencing range of 6 to 30 years (730 ILCS 5/5-4.5-25(a) (West 2014)). Because the 12- and 8-year sentences imposed in this case were within the statutory sentencing range, they are presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 62     Defendant does not dispute that his sentences fall within the permissible sentencing range and are presumed proper. Rather, he argues that his 12- and 8-year sentences are excessive and constitute an abuse of discretion in light of his minimal criminal background and significant support from his family. He highlights that his criminal history consists of only three juvenile adjudications, and that the most recent occurred in 2012, approximately four years prior to the shooting here. This gap, he asserts, demonstrates that he is capable of living a law-abiding life. Defendant further argues that more weight should be given to his overwhelming family and community support. He maintains that the letters and emails presented at sentencing are striking in their conviction that he is a valued person who is capable of contributing to society, and demonstrate that their authors are committed to his success after prison.

¶ 63    The record shows that the trial court was well aware of the mitigating factors identified by defendant on appeal. Defendant's criminal history was included in the PSI report, which the trial court stated it had reviewed prior to imposing sentence. In addition, defense counsel highlighted in mitigation that, based on the letters and emails submitted on defendant's behalf, which the trial court stated it had reviewed, defendant would be returning to a supportive environment upon his release from custody. Finally, while we may presume that the trial court properly considered all relevant mitigating factors presented (*Sauseda*, 2016 IL App (1st) 140134, ¶ 19), here, the trial court expressly noted as mitigation defendant's "lack of criminal history" and strong family and community support.

¶ 64    In addition to considering the evidence in mitigation, the trial court also made clear at sentencing that it was disturbed by the nature of the crime committed, remarking that "this is an extraordinarily violent offense" and that it was only by "the grace of fortune" that no one died. It has long been held that the most important sentencing factor is the seriousness of the offense. See, *e.g.*, *People v. Johnson*, 159 Ill. App. 3d 991, 1001 (1987). Moreover, a trial court need not give greater weight to a defendant's rehabilitative potential or other mitigating factors than to the severity of the offense. *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 82.

¶ 65    Given that the mitigating factors defendant raises on appeal were discussed in defendant's PSI report and defense counsel's arguments in mitigation, defendant essentially asks us to reweigh the sentencing factors and substitute our judgment for that of the trial court. As noted above, this we cannot do. See *Busse*, 2016 IL App (1st) 142941, ¶ 20 (a reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently).

¶ 66    In light of the facts of this case, the interests of society, and the trial court's stated consideration of mitigating and aggravating factors, we cannot find that defendant's sentences, terms on the low end of the Class-X sentencing range, are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Accordingly, we find no abuse of discretion.

¶ 67    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 68    Affirmed.