2022 IL App (2d) 200171-U
No. 2-20-0171
Order filed January 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed und er Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10-CF-2743 |
| ALFONSO L. THOMAS, | ) ) ) | Honorable Gary V. Pumilia, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The evidence presented at trial was sufficient to prove defendant guilty of criminal sexual assault and aggravated criminal sexual abuse beyond a reasonable doubt; defendant waived a claim of ineffective assistance of trial counsel; and defendant's posttrial counsel was not ineffective for not raising an ineffectiveness claim against trial counsel for decisions regarding the medical evidence. Affirmed.

¶ 2    Following a bench trial, defendant, Alfonso L. Thomas, was convicted of two counts of criminal sexual assault (720 ILCS 5/12-13(a)(3) (West 2010)) and one count of aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 2010)). He was sentenced to two six-year terms in prison for the criminal sexual assault counts and a four-year term for the aggravated

criminal sexual abuse count, to be served consecutively. On appeal, defendant argues that he was not proven guilty beyond a reasonable doubt because the victim recanted her accusations both in a notarized letter and during her testimony at trial and defense counsel was ineffective for failing to present evidence to contradict the opinion testimony of the State's medical expert. We affirm.

¶ 3                           I. BACKGROUND

¶ 4                           A.  The Indictment

¶ 5     On September 7, 2010, a criminal complaint was filed against defendant alleging two counts of criminal sexual assault (720 ILCS 5/12-13(a) (West 2010)).  Defendant was subsequently charged by indictment on October 6, 2010, with two counts of criminal sexual assault and three counts of aggravated criminal sexual abuse (720 ILCS 5/12-13(a), 5/12-16(d) (West 2010)). Counts 1 and 2 of the indictment, as amended on October 15, 2012, alleged that on or about March 20, 2010, defendant, who was a family member of R.J., committed an act of sexual penetration with R.J., who was under the age of 18, by knowingly placing his finger in R.J.'s vagina (count 1) and anus (count 2).  Counts 3 and 4 of the indictment alleged that on or about March 20, 2010, defendant, an individual over the age of 17, committed an act of sexual penetration with R.J., who was at least 13 years of age but under 17 years of age, by placing his finger in R.J.'s vagina (count 3) and anus (count 4).  Count 5 of the indictment alleged that on or about March 20, 2010, defendant, an individual over the age of 17, committed an act of sexual conduct with R.J., who was at least 13 years of age but under 17, by knowingly having R.J. touch his penis with her hand for the purpose of sexual gratification or arousal of the defendant or the victim and defendant was at least five years older than R.J.

¶ 6    The charges arise from an incident that allegedly occurred in the early morning hours of March 20, 2010, between R.J. and defendant, who is married to R.J.'s mother, K.J.[1]  On March 21, 2010, Officer Andrew Seale of the Rockford Police Department responded to a call from R.J.'s grandmother's home where R.J. reported the incident.  On May 20, 2010, R.J. went to the public safety building in Rockford where she made a statement detailing the incident to Officer Kevin Nordberg.  Officer Nordberg typed the statement and reviewed it with R.J.  R.J. initialed each paragraph and signed the bottom of both pages acknowledging that it was her statement and that it was the truth.  The statement provides as follows:

> "My name is [R.J.]  My mother, [K.J.], brought me here to speak with Detective Nordberg about what my mother's boyfriend, Alfonso Thomas, did to me.  My mom did not want to bring me here but my grandmother made her do it.
>
> It happened on 03/19/10.  I live with my mother, Alfonso, and my four sisters, [Z.J., K.S., A.D., and A.T.].  Around 11:30 [p.m.], I went to sleep in my sister [Z.J's] room.  I was sleeping in her twin bed.  I had left the TV on to the music channel.  Around 4:00 [a.m.] I was awaken [*sic*] by Alfonso coming into the bedroom and getting into bed with me.  He handed me the remote and told me to find a movie to watch.  I changed the channel to a movie.  Alfonso was slurring his speech.  I think he might have been drunk.  He was telling me that nobody downstairs loved him.  He was referring to the rest of my family because they were all downstairs.  He told me to give him a hug, so I did.  He then asked

---

[1] In her written statement, R.J. refers to defendant as her mother's boyfriend at the time of the alleged incident. However, R.J.'s mother testified that she and defendant have been married since December 2009.

me if I loved him. I told him yes but he told me to say it so I told him I loved him. He pulled me close by him and I was just laying there. He was not saying anything. I was not feeling uncomfortable at this time. I eventually fell back to sleep.

I woke up when I felt Alfonso move his hand underneath my pajama bottoms and into my underwear. He put his fingers into my pussy. I felt it but was not sure what he was doing. Alfonso then moved his fingers and put it [*sic*] into my butt. I sat up in bed and he pulled his hand out. Alfonso took my left hand and put it on his dick through his clothing. He asked me if I wanted him to stop. I told him yes and got out of bed and went to the bathroom.

While I was in the bathroom Alfonso went downstairs. I then went downstairs and laid on the floor with my sisters who were watching television and sleeping. My mom was in the kitchen with Alfonso. When she came into the living room I told her what Alfonso had done to me. I told her he was a pervert. My mom looked at me funny, I laid down and went back to sleep.

Later that day Alfonso bought me a pair of custom earrings that I had been asking to have for a long time. I knew he was buying it because he was calling me on my phone and asking me what I wanted the earrings to say. This was not the way Alfonso normally was. I knew he was trying to get me to keep quite [*sic*] about what he did to me.

When I got home Alfonso kept trying to pull me aside. He kept telling me how much he loved me. This was also not the way Alfonso normally is. He never apologized for what he did to me he just kept telling me he loved me more than anything.

My mom asked me if I wanted her to say anything to Alfonso. I told her that I did. She confronted Alfonso and told him what I had told her about him touching on me.

Alfonso told my mom that I must have been dreaming. He kept asking me if I was serious and kept trying to make it look like I was lying.

Later that day we all went to my grandmother's house. My sister, [K.S.], told my grandmother what Alfonso had done to me. I spent the night at my grandmother's house and she asked me if I wanted to call the police. I told her I did. When my mom found out that my grandmother had called the police she kicked Alfonso out of the house.

I think Alfonso should be put in jail because if he doesn't [*sic*] he will move out of town with my mom and my little sister will go with her. I don't want Alfonso to be touching on her or any of my other sisters. Before this happened to me I thought Alfonso was ok. He was decent to me and my sisters. Now I hate Alfonso for what he did to me. I am angry at my mom for not believing me and for still talking to Alfonso."

¶ 7                                    B.  The Bench Trial

¶ 8     A two-day bench trial commenced on October 15, 2012, before Judge Gary V. Pumilia. The State's first witness was K.J., R.J.'s mother. She testified that R.J. is one of her five children. She stated that she had been married to defendant, who was born on February 8, 1980, since December 2009. On March 20, 2010, she was living with her children and defendant in their home in Rockford.

¶ 9     R.J. was called to testify. She testified that she was born on March 29, 1996, and a junior in high school. She stated that she knows defendant because he is married to her mom and is her three-year-old sister's dad. She explained that she does not see him any longer because "he just doesn't come around."

¶ 10    R.J. testified that on March 20, 2010, she was 13 years old, though she turned 14 just over a week later. At that time, she was living with her mother, defendant, and her siblings, in a two-

story house in Rockford. She described their home as having a living room, dining room, and kitchen on the first floor and four bedrooms on the second floor. She explained that two of her sisters shared a bedroom, she and her older sister had their own rooms, and her mother and defendant shared a room.

¶ 11 On the evening of March 19, 2010, R.J. testified that when she went to bed, she decided to sleep in her sister's bed. Her mother and siblings were all in the living room where they had fallen asleep. She was the only person upstairs that night. When asked how she woke up that day, she stated "I just woke up." When asked what happened next, R.J. replied: "Same thing that happens any other day" and "Wake up, talk to my mom and my sisters." When asked if she told her mom that morning that defendant had done anything to her, she replied "No."

¶ 12 R.J. stated that she did go to her grandmother's house the next day, but she denied telling her grandmother that defendant had done anything to her. However, she acknowledged that the police were called to her grandmother's house, and she spoke to Officer Seale. Her aunt, cousins, and sisters were all at her grandmother's house that day. She said that her grandmother and aunt were with her when she spoke to the police. She admitted that she told Officer Seale that defendant had "molested" her. She admitted that she told him that she was lying in bed and defendant came upstairs and got into bed with her. R.J. told the police that defendant said none of her sisters would cuddle with him. Defendant asked R.J. if she loved him, and she said she told him "yes." She told the police that defendant asked to watch a movie, so she changed the channel to a movie, and then she went back to sleep. She testified that she told the police that defendant was sleeping beside her, he tickled the outside of her right leg, and he then put his hand in her pants and started touching her. She admitted she told Officer Seale that defendant touched her with his hand inside her vagina and her butt. She then told the police she got up and went to the bathroom, then she went and told

her mom what happened. This all occurred around 4 a.m. on March 20, 2010. She admitted that she told Officer Seale that after she talked to her mom, she stayed downstairs and slept in the living room with her siblings.

¶ 13    Later in the day on March 20, 2010, defendant called R.J. to talk to her about buying her earrings. She explained that they "were already talking about buying the earrings, and then I guess he -- and then he was talking about going to order [the] earrings." He called to ask her what she wanted the earrings to look like. R.J. stated that defendant did buy her the earrings.

¶ 14    R.J. testified that two months later, on May 20, 2010, she went to the public safety building with her mother to talk to Detective Nordberg.  She explained that she was alone with Detective Nordberg when she gave her statement.  When asked whether her mother wanted to take her to make the statement, R.J. replied: "I don't know if she wanted to bring me or not."   She admitted that she told Detective Nordberg about the incident, and he typed it on the computer, gave her a printed copy, and allowed her to read it.  She admitted that she read the statement, initialed each paragraph, and signed both pages acknowledging that it was her statement and that it was the truth. She admitted that she told Detective Nordberg it was the truth. However, when asked whether the statement was the truth, R.J. stated that it was not and she "made it up."  The following colloquy took place:

> Q:  Is this statement the truth?
>
> A:  No.
>
> Q:  Why isn't it?
>
> A:  Because I made it up.
>
> Q:  You did?  How come?
>
> A:  Because I thought it was going to stop my mom from taking to [defendant].

Q: Why would you want that?

A: Because she wasn't acting like a mom to her kids.

Q: So when's the first time you decided to make this up?

A: What do you mean?

Q: When did you decide to make this up?

A: When my mom started showing him more attention than her kids.

Q: So at 4:00 a.m. on March 20th, you decided to make this up?

A: No.

Q: Well, that's the first time you told your mom, isn't it?

A: Yeah, but I didn't just pick a date.

Q: But you admitted that the first time you told your mom that this defendant did something to you that he shouldn't was at 4:00 a.m. on March 20th, 2010, isn't that right?

A: No, it was the next morning.

Q: And that is in March, and two months later [when she made the written statement] you are still making this up; is that right?

A: Yep."

¶ 15    The State then reviewed each line of the written statement with R.J. asking whether the information was true. R.J. testified that it was true that her mother took her to speak with Detective Nordberg about what defendant did to her. R.J. said she told Detective Nordberg that her mother did not want to take her to give her statement and her grandmother made her mom take her, but she now said did not know if her mom wanted to bring her or not. She said the statement was true that she lived with her mom, defendant, and her siblings. She testified that it was true that on March 19, 2010, at around 11:30 p.m. she went to sleep in her sister's room and left the television

on to the music channel. She said it was true that around 4:20 a.m., she was awakened by defendant coming into the bedroom and getting into bed with her. She said it was true that he handed her the remote and told her to find a movie to watch and she changed the channel to a movie. She said she did not remember if defendant was slurring his speech or was drunk. When asked why she would think he might be drunk, she replied "If he was slurring his speech, then he was probably drunk." When asked again, "So he was slurring his speech?", she replied "Sure."

¶ 16    At this point, the State asked R.J. if she wanted to be in court, and she said no. She acknowledged that her mom was not happy about having to bring her to court. When asked "When you guys leave here, she makes it clear she's not happy about coming here and not happy about me [State's attorney]; isn't that right?" R.J. replied "yeah." When asked whether "it would be much easier for you if this never happened and you didn't have to go through this?", she answered "Yes."

¶ 17    R.J. admitted it was true that defendant told her that "nobody downstairs loved him" and he told her to give him a hug. She admitted it was true that defendant asked her if she loved him and told her to say it, so she did. When asked if it was true that he pulled her close to him, she said no. She admitted that she was not feeling uncomfortable at that time. She then fell back to sleep.

¶ 18    When asked about her statement to the police where she said that she woke up when defendant moved his hands underneath her pajama bottoms and into her underwear, R.J. stated that it was not true. She said that the parts of her statement describing that defendant put her fingers into her vagina and anus were not true. R.J. also admitted that she told the police in her statement that defendant took her left hand and put it on his penis through his clothing, but she testified that this was not true. When asked about her statements that she went into the bathroom, then

downstairs to lay on the floor with her sisters who were watching television and sleeping, she said that was not true. She denied any interaction with her mother at that time, including telling her that defendant did anything inappropriate to her that night or telling her defendant was a pervert.

¶ 19    She admitted that the statement describing that defendant purchased her custom earrings that she had been asking to have for a long time was true. R.J. said that her statement that she knew defendant was trying to keep her quiet about what he did to her was not true. She also stated that it was not true that defendant kept trying to pull her aside or tell her how much he loved her. R.J. testified that the statements regarding her conversation with her mother about confronting defendant and her mom's confrontation with defendant and were not true.

¶ 20    When asked whether her statement that "Later that day we all went to my grandmother's house" was true, she said no, they did not go to her grandmother's house. She said it was not true that her sister told her grandmother about what defendant did to her. When asked whether she spent the night at her grandmother's house and her grandmother asked if she wanted to call the police, she stated this was true. R.J. said it was true that when her mother found out that her grandmother called the police, her mother kicked defendant out of the house. When asked about the last sentence of her statement "I am angry at my mom for not believing me and still talking to [defendant]" she answered "Yeah."

¶ 21    R.J. testified that she never told the State's attorney that her previous statements to the police were untrue, and the following colloquy took place:

> Q: This is – this has been tough on your family?
>
> A: Yeah.
>
> Q: Your mom is still married to the defendant?
>
> A: I guess.

Q: And you don't like to see your mom upset?

A: No

Q: And you've had to come to court several times and miss school for this case; isn't that right?

A: Yes.

Q: And every time your mom brings you?

A: Yeah.

Q: And your mom is not happy about having to do that either, is she?

A: No.

Q: On September 26, 2012, you wrote a note saying that you had made this whole thing up; isn't that right?

A: Yeah.

Q: Who—where did you write that note?

A: At home.

Q: And who did you give it to?

A: What do you mean?

Q: Well, you wrote the note. What did you do with it?

A: I went and got it notarized.

* * *

Q: And how did you know you had to have it notarized?

A: Because I know that you have to have it notarized.

Q: How do you know that?

A: My mom told me."

¶ 22    On cross-examination, R.J. testified that defendant bought the custom earrings for her right around the time her interaction with the police was happening which was two or three days before her birthday. She explained that she had talked to defendant weeks before this alleged incident about the earnings which she wanted for her birthday. After restating that many of the things she put in her statement were not true, R.J. was asked whether she was telling the truth then or now; she answered, "I'm telling the truth now."

¶ 23    R.J. stated that she has not had much contact with defendant since the incident. She did not know how long her mother and defendant had been married prior to the incident, but she stated that her relationship with her mom changed after the marriage. R.J. was asked further about that:

> "Q:  In what way [did your relationship with your mother change]?
>
> A:  We – it was just – do you mean like in a bad way or how?  It just was like we don't talk or nothing.  We didn't do stuff like we used to.
>
> Q:  Did you feel like the amount of attention that you would seek from your mom was less after she got married to [defendant]?
>
> A:  Yeah.
>
> Q:  How did that feel?
>
> A:  Bad.
>
> Q:  Did you want it to go back to the way it was before?
>
> A:  Yeah.
>
> Q:  And do you think it would have gone back to the way it was before if [defendant] wasn't there anymore?
>
> A:  Yeah."

¶ 24    R.J. was then asked again about her written statement regarding the interaction between her and defendant that morning in her sister's room.  She denied any inappropriate touching occurred.  She admitted that she put all of those things in her statement and said that they were true when she spoke with Officer Nordberg.

¶ 25    R.J. was asked about her handwritten letter dated September 26, 2012. She testified that her intention in writing that letter was "To let them know that what I said – that I lied about what I said."  Although the handwritten letter was admitted into evidence, it is not in the record on appeal.  The following colloquy took place regarding the letter:

> "Q:  Did anyone tell you what words to use?
>
> A:  No.
>
> Q:  In that statement, you said that you're writing to state that this is a whole misunderstanding?
>
> A:  Yeah.
>
> Q:  That you didn't believe that the situation would go this far.  I'm sorry I lied about the whole thing?
>
> A:  Yeah.
>
> Q:  I lied because I was angry with my mom?
>
> A:  Yeah.
>
> Q:  I just wanted her to put more attention into us, her kids, more than she was with her husband?
>
> A:  Yeah.
>
> Q:  I was angry and didn't realize this was serious and didn't even think it would go far?

A:  Yeah.

Q:  I know what I did was wrong, but I just wanted to take the time to say I'm sorry for all this confusion and misunderstanding?

A:  Yeah.

Q:  What I said was a lie, and I know lying is wrong, but at the time I really didn't care?

A:  Yeah.

Q:  And then you signed that, right?

A:  Yes."

¶ 26     R.J. acknowledged that she met with defense counsel believing that he was going to take her recantation statement and type it for her.  However, R.J. explained that she subsequently took her handwritten letter to defense counsel at which time he informed her that it must be notarized.  R.J. was asked further about the letter:

"Q:  When you said in this handwritten statement that you didn't think things would go this far, were you saying that you didn't think you would have to come and testify and be uncomfortable, or you just didn't think anything would happen because of what you told your mom?

A:  I didn't think that anything would happen.  I didn't think that I was going to have to go through court and all that.

Q:  Did you think that by talking to the police that that would result in the end of your mom's relationship with [defendant]?

A:  Yes.

Q:  Is that what you wanted?

A: Yes."

When asked when she first told someone that she made up the story, she replied "I don't know. I really didn't tell anyone that I made it up." She then said she did tell her mother.

¶ 27 Questioning regarding the handwritten statement continued during redirect examination:

"Q: When you say you never thought things would go this far, you didn't think the defendant was going to get arrested; is that what you were saying?

A: Yeah, I thought he was going to get arrested, but I didn't think that I was going to have to go to court.

Q: And a year ago when you met with me, we talked about maybe it would have to go to court, right?

A: Yeah.

Q: Yeah. And you didn't tell me a year ago that this didn't happen; isn't that right?

A: Yeah."

¶ 28 When asked when it was that she first decided to make this up, R.J. responded that she did not remember. When asked further, she responded that she was at home in her living room when she decided to make this up. She thought it was the day before it happened.

¶ 29 On redirect, R.J. acknowledged that she was examined by Dr. Davis at the MERIT Clinic on June 29, 2010. She admitted that she told Dr. Davis that defendant had put his finger in her anus. She admitted that she did not tell Dr. Davis that none of this was true. She admitted that she met with the prosecutor's office in December 2011 and never told them she was lying about the incident.

¶ 30 On recross, R.J. admitted that she told Dr. Davis all of the things she told Officer Nordberg about the incident. She admitted that there was a time when she was worried that her mom and

younger sister would move out of town with defendant. She did not want to move. When asked if it was possible that everything in the original statement she gave to Officer Nordberg was true and that her handwritten letter and her testimony were lies, she answered "No."

¶ 31    The court then questioned R.J. as follows:

"Q:  You are in a tough spot, aren't you, R.J.?

A:  Yeah.

Q:  Do you think there's anything good that can come out of it?

A:  That this will be over.

Q:  Did you think your mom would be mad at you for lying about [defendant]?

A:  Probably.

Q:  Did you think that would help your relationship with your mother?

A:  No, but then again she wouldn't talk to him anymore.

Q:  Who were you mad at, your mom, or [defendant]?

A:  My mom.

Q:  Why did you take it out on [defendant]?

A:  I don't know.

Q:  This is a lot for a 16-year-old to carry around, isn't it?

A:  Yeah.

Q:  It's been going on for, what is this?  Nearly a third year now?

A:  Yep.

Q:  You've had to live with it every day?

A:  Yeah.

Q:  When did it start to really get to you?

A: I don't know, probably when they told me that I had to come to court and testify.

Q: When did they tell you that?

A: I don't remember.

Q: A long time ago?

A: Yeah.

Q: What's the best thing that could happen out of all of this for you?

A: What do you mean?

Q: I mean, what's the best outcome? How do you want your life to be put back together?

A: Once this is over with, then I don't have to come.

Q: I missed part of that. Once it's over with what?

A: Then that's when I don't have to come to court again.

Q: Right now you've got pressure on you from all over the place, don't you?

A: Yeah.

Q: No matter what you do, it's the wrong thing?

A: Yeah.

Q: Do you feel like that's the spot you're in?

A: Yeah.

Q: Do you think there's a right thing for you to do, a way that you can make things come out good?

A: I don't know."

¶ 32    R.J. said her mom is not happy about the situation and is not happy with her. She said she did not know if her mom was happy with defendant. R.J. stated she thought she could make things

right with her mom, but she had not talked to her mom about the situation or what will happen when this is all over. She acknowledged that lying is a serious matter, and she assumed she could get in trouble for lying. When asked which she thought was worse, lying to the police or lying to the court, she replied "Lying to the police."

¶ 33     Office Andrew Seale, a patrol officer with the Rockford Police Department, testified that he responded to a call at 10:38 a.m. on March 21, 2010, at R.J.'s grandmother's house. He spoke with R.J. alone, and she told him about the incident that took place in the early morning hours of March 20, 2010. R.J. told him she was asleep in an upstairs bedroom in their home when defendant came into the room. R.J. told him that defendant asked her if she loved him, and she responded that she did. R.J. told him that defendant got into bed with her, pulled her close, and tickled her leg. R.J. had fallen asleep and woke up when defendant had his hands inside her pants. R.J. told him that defendant put his finger in her anus.

¶ 34     Officer Kevin Nordberg, a detective with the Rockford Police Department, testified that in March 2010, he was assigned to investigate the allegation of sexual abuse in this case. He met R.J. on May 20, 2010, at the public safety building. Officer Nordberg initially spoke with R.J. to get a verbal account of the incident. He then typed her statement on his computer, referring to his notes and asking R.J. questions that came up as he completed her statement. Officer Nordberg then printed the statement, read it aloud to her, and gave her the opportunity to make any corrections. He then had R.J. initial each paragraph and sign both pages of the statement. R.J. signed the statement affirming that it was true and accurate. Officer Nordberg acknowledged that People's Exhibit No. 1 was an exact photocopy of the statement.

¶ 35     Officer Nordberg testified that he met with defendant on June 30, 2010, in the public safety building. Detective Joyce was present. Defendant was given his *Miranda* rights both verbally and

in writing. After acknowledging his *Miranda* rights, defendant answered questions. Defendant said that on the evening and early morning of March 19 and 20, 2010, he had been out drinking. He arrived home between 2 and 3 a.m. Defendant told Officer Nordberg that "when he drinks he gets very touchy-feely and he likes a lot of hugs and such." Defendant told the officer that when he returned home, everyone on the first floor was asleep, so he went upstairs where R.J. was sleeping, woke her up, and started tickling her. Defendant said he got into bed with her and was "messing with her." Officer Nordberg clarified that defendant did not definitively say he got into bed with R.J., but he did not deny doing so. When asked if he instructed R.J. to find a movie on television, he said that sounded "like something he would do." When Officer Nordberg explained to him what R.J. had said, specifically about him putting his finger in her vagina and anus, defendant told the officer that he would not do that and explained "I can get any girl that I want even a nerdy girl." When asked if he knew why R.J. would accuse him, defendant say he did not know. Defendant admitted to purchasing earrings for R.J. as a birthday gift. When asked if he still sees and speaks to R.J.'s mother, defendant said he sees her and talks to her daily.

¶ 36    On cross-examination, Officer Nordberg stated that defendant was not under arrest but came to the interview at the officer's request. The interview was not recorded.

¶ 37    Dr. Raymond A. Davis, Jr., testified that he is a board-certified pediatrician with Rockford Health Physicians, and he runs the Medical Evaluation Response Initiative Team (MERIT), which is a child protection service at the University of Illinois College of Medicine in Rockford. He is board-eligible for the subspecialty of child abuse and neglect (which had become a formal specialty in 2009). He has been involved in the child-sexual-abuse and neglect medical field since 1988. The MERIT program provides expert evaluations for children that have been sexually abused, physically abused, or neglected, and provides community education for law enforcement, the

Department of Children and Family Services, and other groups in the area of child abuse and neglect.

¶ 38   Dr. Davis examined R.J. on June 29, 2010, at the MERIT exam location on the campus of Rockford Memorial Hospital.  Dr. Davis met with R.J. and her mom to get a medical history and discuss what happened.  R.J. told him that she was in an upstairs bedroom when defendant came in and told her that no one loved him and asked her to tell him that she loved him.  She said she fell asleep, but she woke up when defendant had his finger in her anus.  She told him that defendant wanted her to touch his penis, but she did not.  R.J. told Dr. Davis that she then went downstairs and reported it to her mother.

¶ 39   Dr. Davis performed a routine medical exam on R.J. looking at all areas of the body.  He then did a colposcopic exam of her vaginal area and rectal area.  During his testimony, he referred to the medical chart he used to diagram the area of examination.

¶ 40   On the rectal exam, R.J. had two small fissures—small splits in the superficial layers of the skin—at about the 11 o'clock and 1 o'clock positions in the perineal tissue, which is the tissue between the hymenal opening and the rectum. He also observed fissures on the anal canal at 1 and 5 or 6 o'clock.  Regarding her vaginal exam, he noted that R.J. was using a lot of talcum powder in this area which made it "difficult to get a good evaluation at this time." He stated that "it appeared that there was a small tear or hymenal notch in the hymenal tissue at 5 o'clock" and some overall redness or erythema in the vaginal area.   When asked further about the hymenal notch, Dr. Davis explained it is a disruption in the normally round or u-shaped hymenal ring, causing it to appear v-shaped.

¶ 41   Dr. Davis's opinion was that the findings regarding R.J.'s rectal exam were "most likely consistent with probable constipation, although the mother and the child did not state that there

had been problems or issues with constipation." He noted there was some history of "infrequent bowel movements, harder movements, and blood that led me to believe those findings were more consistent with constipation, and the fact that there was no healing process, and less likely to be from any trauma that may have occurred on March 22nd from a finger." Regarding the vaginal exam, he stated that the "hymenal finding of a notch is a suspicious finding for penetrating trauma or vaginal trauma and that's a highly suspicious legion [*sic*] for sexual abuse." He explained further that the notch was more consistent with sexual abuse because it is an area that is "well-protected, so there's very little outside trauma that will cause problems" and based on her history there are no other explanations, unlike for the anal findings, for the injury (R.J. stated she did not use tampons and had not engaged in any sexual activity).

¶ 42    On cross-examination, Dr. Davis noted that the patient's history is an important piece of information when conducting an examination to learn if there are "other extenuating circumstances that might explain any findings we might see on the exam, and then try to get some kind of understanding of what had happened or what had occurred so that we can match those findings or match our findings with the history, and also we take that into account then in forming our opinion." Dr. Davis stated that part of the history was R.J. stated that she was asleep and when she awoke, she felt something in her anus. Dr. Davis acknowledged that she did not indicate that she felt something in her vagina. Dr. Davis testified that a hymenal notch is generally considered a traumatic injury, but that it may not require penetration, but stretching or pulling on the hymenal tissue. It is suspicious for sexual abuse because that is the most frequent cause of such a tear. He opined that 98 percent of the time the hymenal notch is from sexual abuse, two percent of the time there are other causes. Dr. Davis said that redness in the vaginal area during the exam in June was "probably not" caused by an incident in March. He noted that the anal fissures were newer and

not healed, so "that would be inconsistent three months later to have an acute fissure that had not healed."

¶ 43    On redirect, Dr. Davis explained that the redness in the vaginal area could have been caused by the use of talcum powder.  He stated that although the anal fissures and erythema were probably not caused by something that happened in March, it is possible that the notch was caused by something that occurred in March.  It was not an acute injury; it was a healed notch or injury.  Such injuries could heal within about a two-week period.

¶ 44    Dr. Davis further acknowledged that the hymenal notch injury could have occurred or existed prior to March or been caused by something after that date.  Dr. Davis stated that he examined R.J. one time, but because her extensive use of talcum powder made it difficult to get a good evaluation, he recommended that she return for a follow-up exam after avoiding the use of powder and doing some sitz baths.  R.J. did have a second exam with the nurse practitioner about two weeks later.

¶ 45    The State moved for the admission of the written statement made to Office Nordberg, the *Miranda* forms from defendant's interview, and Dr. Davis's medical chart which included notes from his physical examination of R.J. as well as R.J.'s follow-up examination with the nurse practitioner, Lori Thompson, on July 12, 2010.   The written statement to Officer Nordberg and R.J.'s statements to Dr. Davis were admitted as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (752 ILCS 5/115-10/1 (West 2010)). The State rested.

¶ 46    Defendant recalled R.J. as his only witness.  R.J. testified that she, personally, wrote and signed the handwritten statement and had it notarized.  That handwritten statement was entered into evidence, but it is not part of the record on appeal.

¶ 47                        C.  Trial Court's Decision

¶ 48    The court found that the State proved the elements of each count beyond a reasonable doubt.  The court noted it was "baffle[d]" as to why the written statement to the police was so detailed and R.J.'s handwritten letter was so general. The court remarked that R.J.'s testimony was "useful only as far as impeachment of her."  The court stated:

> "I think the evidence, in this case, is clear regarding the position that this young girl finds herself in.  If we go to the second line of [R.J.'s written statement], 'My mom did not want to bring me here but my grandmother made her do it'. [*sic*] And that is clearly the position that she's been in since March 2010, two-and-a-half years, just about."

The court concluded that there were details in her written statement that "only somebody who had experienced these events could relate."  The court noted that after observing R.J. on the stand and watching her answering questions, he concluded that "she was not capable of filling in all of these details on her own unless she experienced them."  The court noted considerable agreement between defendant's and R.J.'s statements to the police.  The court noted R.J.'s "statements of outrage" and "fear of the future" showed her state of mind.  Defendant admitted to entering the bedroom and interacting with R.J., so the court concluded, "it's not a question of if there was an opportunity," but only "whether defendant took advantage of the opportunity."  The court decided "[t]he evidence, in this case, beyond a reasonable doubt says that he did."  Counts 3 and 4 were merged into counts 1 and 2, and judgment was entered on counts 1, 2, and 5.

¶ 49                                  D.  Posttrial Proceedings

¶ 50    On November 8, 2012, defendant field a timely motion for a new trial.  After obtaining new counsel, John Nelson, defendant filed a detailed, supplemental-posttrial motion, arguing numerous errors, including several bases for ineffective assistance of trial counsel, Daniel Wilkins. The claims of ineffective assistance included waiver of a jury trial, the waiver of an opening

statement, the decision to not call certain character witnesses, and allegations of counsel being generally unprepared for trial because of his belief that R.J.'s recantation foreclosed conviction. None of the claims of ineffective assistance pertained to the presentation of medical evidence and expert witness testimony. On December 10, 2013, a hearing was held on the posttrial motion and Wilkins was called to testify regarding the ineffectiveness claims. The court denied defendant's motion. Defendant was sentenced to two six-year prison terms for criminal sexual assault (counts 1 and 2) and a four-year prison term for aggravated criminal sexual abuse (count 5); all three terms to be served consecutively.

¶ 51    Defendant filed a timely notice of appeal on January 19, 2014; however, the appeal was dismissed due to defendant's failure to timely file his appellate brief. On January 26, 2015, defendant, represented by new counsel, filed a timely postconviction petition alleging, *inter alia*, that his trial and posttrial counsel rendered ineffective assistance. The petition advanced to the second stage and an amended petition was filed on August 3, 2016. On February 27, 2020, the parties appeared before Judge Debra D. Schafer and the petition was disposed of by agreement of the parties based on appellate counsel's handling of the original direct appeal. The trial court entered the following order: "Upon motion of the petitioner [and] upon the court's order entered [February 27, 2020] allowing the defendant to refile his notice of appeal[,] the amended postconviction petition is withdrawn. [Defendant] is further barred from any future postconviction petitions based on the issue of ineffective appellate [*sic*] counsel (John Nelson)." In accordance with the court's order, a new and timely notice of appeal was filed.

¶ 52                                   II. ANALYSIS

¶ 53                          A.    Sufficiency of the Evidence

¶ 54    Defendant first argues that his convictions must be reversed because the evidence was insufficient to prove him guilty beyond a reasonable doubt.  He contends that R.J. gave conflicting accounts of the alleged incident in this case, *to wit*, her statement to Officer Seale, her written statement taken by Officer Nordberg, and her statements to Dr. Davis.  Thereafter, she recanted her allegations of abuse against defendant in a notarized letter and during her trial testimony.  He asserts that it "defies logic that more weight would be afforded to three unsworn, self-contradictory prior inconsistent statements, than two sworn, internally consistent statements given with a plausible, unrebutted explanation of the complainant's prior motive to lie." [2]   In this regard, he asserts that R.J. clearly identified her reasons for making the accusations against defendant (she was angry with her mother because defendant was taking her mother's attention away from her and her siblings and she thought this would make her stop talking to him) and why she subsequently decided to recant those allegations (she learned she would have to testify about the matter in court and admit she lied to the police).  Finally, he contends that there is no causal link between the alleged incident of abuse and the medical evidence presented.

---

[2] In its brief and surreply brief, the State argues that we should disregard portions of defendant's statement of facts because it contains improper argument and misconstrues the State's position regarding the medical evidence. Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020), requires the facts to be "stated accurately and fairly without argument or comment."  The rules of procedure concerning appellate briefs are rules and not mere suggestions; therefore, we have disregarded any portions of the statement of facts that violate our rules.  See *In re S.F.*, 2020 IL App (2d) 190248, ¶ 16.

¶ 55    When presented with a challenge to the sufficiency of the evidence, "a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64.  "It is the trier of fact's responsibility to determine the witnesses' credibility and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence; we will not substitute our judgment for that of the trier of fact on these matters." *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). It is the trier of fact that weighs how flaws in part of a witness's testimony, including inconsistencies with prior statements, affect their credibility as a whole. *People v. Cunningham,* 212 Ill. 2d 274, 283 (2004).  "A trier of fact is free to accept or reject 'as much or as little' of a witness's testimony as it likes." *People v. Rouse,* 2014 IL App (1st) 121462, ¶ 46 (quoting *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004)).  A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates reasonable doubt of the defendant's guilt. *Jackson*, 2020 IL 124112, ¶ 64.

¶ 56    In support of his argument, defendant compares this case to *People v. Schott*, 145 Ill. 2d 188 (1991).  In *Schott*, the inconsistences in the complaining witness's statements and testimony regarding alleged abuse by the defendant were substantial, including, the location, time of year, number of occurrences, and nature of the alleged abusive conduct; that the witness on several occasions denied that the defendant had abused her, and said that an uncle had abused her; that the witness then admitted the accusations against the uncle were untrue; and that she admitted she lies "a lot." *Id.* at 191-93. Our supreme court concluded that the complaining witness's testimony was "so fraught with inconsistencies and contradictions, that we find her testimony so lacking in

credibility that a reasonable doubt of defendant's guilt remains." *Id.* at 206-07. After reviewing the record in this case, we find the comparison of *Schott* to this case to be without merit.

¶ 57    A review of the evidence presented at trial reveals that R.J.'s testimony and defendant's own account of their initial interaction in the early morning of March 20, 2010, are, in fact, consistent with R.J.'s three prior statements. R.J. testified that when she went to bed on the evening of March 19, 2010, she decided to sleep in her sister's twin bed and left the television on the music channel. She testified that she was the only person sleeping upstairs because her mother and siblings had fallen asleep in the living room. She said it was true that she was awakened around 4:20 a.m. when the defendant came into the bedroom and got into bed with her. She said it was true that he handed her the remote and told her to find a movie to watch and she changed the channel to a movie. She said she did not remember if he was slurring his speech or not, but when asked why she would think he might be drunk, she replied "If he was slurring his speech, then he was probably drunk." When asked again "So was he slurring his speech?" she replied 'sure." R.J. admitted that defendant told her that "nobody downstairs loved him" and he told her to give him a hug. She admitted defendant asked her if she loved him, told her to say it, and she did. She said she was not feeling uncomfortable at this time and said she fell back to sleep. These admissions during R.J.'s testimony are consistent with her prior accounts. Also, during an interview with Detective Nordberg, defendant admitted that he had been out drinking and arrived home between 2 and 3 a.m. on the morning of March 20, 2010. Defendant told Office Nordberg that "when he drinks he gets very touchy-feely and he likes lots of hugs and such." Defendant told Officer Nordberg that when he got home, everyone on the first floor was asleep, so he went upstairs where R.J. was sleeping, woke her up, and started tickling her. Defendant did not say whether he got into bed with her, but he did say he tickled her and was "messing with her."

¶ 58    Furthermore, R.J.'s description of defendant's conduct after their initial interaction that morning, while not identical in each of her three prior statements, is not as "self-contradictory" as defendant suggests. When Officer Seale was called to her grandmother's house the day after the incident, she described her interaction with defendant and admitted that she told him that after defendant got into bed with her, "he put his hand in my pants and started touching me." Specifically, she admitted that she told Officer Seale defendant placed his finger in her vagina and "butt." Two months later, on May 20, 2010, R.J. gave a detailed statement to Detective Nordberg. R.J. acknowledged that she signed the written statement detailing the alleged abuse that occurred when defendant entered the room and got into bed with her that morning. She had fallen back to sleep, but she awoke when she felt defendant "move his hand underneath [her] pajama bottoms and into [her] underwear." She stated that he put his fingers into her vagina and then her butt. She then sat up in bed and pulled his hand out, after which defendant "took [her] left hand and put it on his dick through his clothing." He asked her if she wanted him to stop and she said "yes" and got out of bed and went to the bathroom. R.J. testified that a month later during her examination by Dr. Davis, she told Dr. Davis all of the things that she told Officer Nordberg. Dr. Davis testified that R.J. said defendant told her "a bunch of stories about how nobody loved [defendant] and [he] wanted [R.J.] to tell him that she loved him." She told him that after talking with defendant, she fell asleep, but woke up and defendant had his "finger in her butt." Dr. Davis stated that R.J. said defendant "wanted her to touch his penis, but she didn't."

¶ 59    At trial, R.J. recanted the statements she made about defendant touching her inappropriately. She said she lied about defendant's conduct because she was angry with her mother for spending more time with defendant than with her and her siblings. She could not recall when she decided to make the allegations, but later testified that it was the day before the incident.

She denied that the defendant's purchase of custom earrings for her was a gesture to keep her quiet about what he did to her. She started to become concerned about lying when she realized she would have to testify in court. However, she acknowledged that she had been informed that she would have to testify in court "a long time ago" but still did not tell anyone she made up the story. She explained that she wrote the letter dated September 26, 2012, and had it notarized to explain that it was a "whole misunderstanding," that she "didn't believe the situation would go this far," and she made up the allegations.

¶ 60    "It is well settled that recantation of testimony is generally regarded as unreliable, especially where it might have resulted from duress or perceived threat." *Jackson,* 2020 IL 124112, ¶ 67. Under such circumstances, it is for the trier of fact to determine credibility of the recantation testimony. *Id.* Here, defendant asks this court to substitute our judgment for that of the trial court by accepting R.J.'s recantation testimony and reversing his conviction. Only in "extraordinary circumstances" will courts grant a new trial on the basis of recantation testimony. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). We conclude that such extraordinary circumstances do not exist in this case.

¶ 61    After weighing all of the evidence, the court determined that R.J.'s prior statements to Officer Seale, Detective Nordberg and Dr. Davis, describing the alleged abuse were credible and her recantation was not. The court noted that after observing R.J. on the stand and watching her answering questions, he concluded that "she was not capable of filling in all of these details on her own unless she experienced them." The court further noted considerable agreement between defendant's and R.J.'s statements to the police. As the trier of fact, the trial judge was in the best position to assess R.J.'s demeanor and credibility. The judge questioned R.J. extensively regarding the difficult position she was in because of this case and her relationship with her mom. When the

judge asked R.J. why she took out her anger at her mom on the defendant, she replied she did not know. When asked about what she wanted to happen and what the best outcome for all of this would be for her, she replied several times for it to be over so she would not have to come to court anymore. At one point during cross-examination, R.J. admitted that her mom was not happy with her and it would be much easier for her if this never happened, so she did not have to appear in court. As the judge noted, R.J. told Detective Nordberg that her mother did not want to take her to talk to the police, but R.J.'s grandmother made her. The judge concluded that this seemed to be the same position she remained in over two years later. After reviewing the totality of the evidence presented, we conclude that a rationale trier of fact could have found the essential elements of the crimes charged proven beyond a reasonable doubt.

¶ 62    We note that defendant argues further that the lack of evidentiary support for defendant's conviction for aggravated criminal sexual abuse (count 5) is "especially acute, and that conviction should be reversed because it is based solely on a bare allegation in an unsworn, contradicted, and twice-recanted prior inconsistent statement." The evidence supporting the inappropriate touching alleged in count 5 was in R.J.'s written statement to Detective Nordberg. R.J. said she sat up and pulled defendant's hand away from her after he had placed his finger in her vagina and butt, and then defendant took her left hand and placed it on his penis outside of his clothing. She then reported that defendant asked her if she wanted him to stop. She replied "yes" and got out of bed and went into the bathroom. During her testimony at trial, R.J. said she lied about this conduct. Dr. Davis also testified that R.J., who was 14 years old at the time, told him that on the morning of the incident defendant wanted her to touch his penis, but she did not. As we previously noted, it is for the trier of fact to weigh the credibility of the witnesses and weight to be given to the testimony and resolve any conflicts in the evidence.

¶ 63                          B.  Ineffective Assistance of Counsel

¶ 64    Defendant argues that both trial and posttrial counsel were ineffective for failing to challenge the opinion testimony of Dr. Davis.

¶ 65    Defendant first argues that his trial counsel, Wilkins, was ineffective for failing to bring attention to the discrepancies between R.J.'s first and second MERIT exams and challenge Dr. Davis's opinion in this regard.  The State argues defendant waived this claim by failing to preserve the issue for review. We agree.

¶ 66    To preserve an issue for appeal, there must be both an objection at trial and the issue must be included in a posttrial motion.  *People v. Enoch,* 122 Ill 2d 176, 186 (1988).  The purpose of including the specific claimed error in a posttrial motion is to clarify the issues on appeal and to allow the trial court the opportunity to correct any errors and grant a new trial if necessary.  See *id.* An attorney who represented a defendant at trial is not expected to file a motion alleging his own ineffectiveness.  See *People v. Keener*, 275 Ill. App. 3d 1, 5 (1995) ("A *per se* conflict of interest arises when attorneys argue motions in which they allege their own ineffectiveness."). However, when defendant has a new attorney representing a defendant in posttrial proceedings, posttrial counsel will not face a conflict of interest in claiming ineffectiveness of trial counsel; thus, waiver applies if a claim is not raised before the trial court.  *People v. Ramos*, 339 Ill. App. 3d 891, 900 (2003).

¶ 67    After his trial, defendant was appointed new counsel, Nelson.  Nelson filed a detailed posttrial motion alleging numerous errors, including several bases for ineffective assistance of trial counsel.  However, none of the claims of ineffective assistance pertained to the presentation of medical evidence and expert witness testimony.  After a hearing on the motion where Wilkins testified, the trial court denied the motion, finding that Wilkins was effective in his representation

of defendant and that he met reasonable standards as to each claim. Having had the opportunity to raise this issue before the trial court, and failing to do so, we deem it waived.

¶ 68 Accordingly, we will address this matter only in the context of the ineffective assistance of counsel claim as to defendant's posttrial counsel.

¶ 69 Defendant argues that his posttrial counsel, Nelson, rendered ineffective assistance by failing to raise trial counsel's ineffectiveness on the issue of the medial evidence. He argues that the inconsistency between the hymenal notch findings from R.J.'s first and second MERIT exams is "exculpatory medical evidence the defense could have used to meaningfully undermine the State's case and support its theory that [defendant] did not sexually abuse R.J. on March 20, 2010." Therefore, Nelson should have made an additional ineffectiveness claim in the supplemental posttrial motion.

¶ 70 Illinois courts address ineffective assistance of counsel claims under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must prove: (1) that his defense counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for this substandard performance, the result of the proceedings would have been different. *People v. Alvine,* 173 Ill. 2d 273, 293 (1996). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Mere conjecture and speculation are not sufficient to establish this probability. *People v. Gosier,* 165 Ill. 2d 16, 24 (1995). Because a defendant's failure to establish either part of the *Strickland* test will defeat an ineffectiveness claim, a court need not address both components of the inquiry if defendant makes an insufficient showing on one. *Strickland,* 466 U.S. at 697. Thus, a court considering such a claim "need not determine

whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

¶ 71    A mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective. *People v. Perry,* 224 Ill. 2d 312, 355 (2007). Such decisions are sufficient to establish ineffectiveness only if trial counsel's chosen strategy is so unsound that counsel completely fails to conduct any meaningful adversarial testing of the State's case. *Peterson,* 2017 IL 120331, ¶ 80. After reviewing the evidence, we determine that Nelson's decision to forego a claim of ineffectiveness on the basis of the medical testimony did not constitute ineffective assistance.

¶ 72    Defendant argues that it should have been apparent to Nelson that Wilkins's decisions regarding the medical testimony and evidence were deficient. Specifically, Dr. Davis should have been cross-examined about R.J.'s second MERIT examination which revealed his findings regarding the hymenal notches were different than the observations of Lori Thompson, the nurse practitioner who competed the second MERIT examination. He also argues Thompson should have been called to testify as to her findings. However, determining which witnesses to call and what evidence to present are decisions left to the discretion of trial counsel after consulting with defendant and ordinarily will not support a claim of ineffective assistance of counsel. *People v. Peterson,* 2017 IL 120331, ¶ 80. Also, a review of the record reveals that Dr. Davis's opinion was meaningfully challenged by Wilkins and Thompson's findings were, in fact, admitted into evidence. Dr. Davis did observe one hymenal notch, despite his acknowledgement that it was difficult to get a good evaluation at the time due to the presence of talcum powder. However, he admitted that the notch was healed, which he opined could generally occur within two-weeks. Therefore, he acknowledged that the notch could have been caused by trauma on March 20, 2010,

but it also could have been present before that date or it could have been caused by something after that date. Further, Dr. Davis noted that the fissures found during the rectal exam were likely caused by constipation and not by any trauma on March 20, 2010. Although Thompson was not called to testify, her findings were, in fact, admitted into evidence. Thompson's findings supported Dr. Davis's acknowledgement of the limitation in his examination, namely, that it was difficult for him to make a good evaluation due to R.J.'s use of talcum powder and his acknowledgment on cross-examination that the timing of injury was uncertain.

¶ 73 Based on the foregoing, we conclude that Nelson's decision to forego including an ineffective assistance of counsel claim based on Wilkins's decisions regarding the medical evidence at trial did not, standing alone, constitute ineffective assistance of counsel. " ' Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced.' " *People v. Johnson*, 2021 IL 126291, ¶ 55 (quoting *People v. Patterson*, 2014 IL 115102, ¶ 81). After reviewing the claims regarding the medical evidence in the context of the totality of the evidence presented, we conclude defendant was not prejudiced because there is no reasonable probability that the result of the proceedings would have been different had the claim been raised.

¶ 74                                     III. CONCLUSION

¶ 75 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 76 Affirmed.